BALTIMORE & O. R. CO. v. TAYLOR.

(Circuit Court of Appeals, Fourth Circuit.   March 31, 1911.)

No. 991.

**1. NEGLIGENCE (§ 136*)—QUESTIONS FOR COURT OR JURY.**

Questions of negligence do not become questions of law for the court, except where the facts are such that all reasonable men draw the same conclusion from them; the court being unauthorized to withdraw the case from the jury unless the conclusion follows as a matter of law that no recovery can be had on any view which can be properly taken of the facts the evidence tends to establish.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 277; Dec. Dig. § 136.*]

**2. MASTER AND SERVANT (§ 286*)—DEATH OF SERVANT—RAILROADS—DEFECTIVE ROADBED—NEGLIGENCE—QUESTION FOR JURY.**

In an action for the death of a railroad engineer by the collapse of a part of the roadbed as he was passing over it at night, evidence *held* to require submission of defendant's negligence to the jury.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 286.*]

**3. MASTER AND SERVANT (§ 112*)—DEATH OF SERVANT—RAILROADS—MAINTENANCE OF WAY—DUTY OF RAILROAD COMPANY.**

A railroad company is bound to use reasonable care to make and maintain its roadbed in a reasonably safe condition for the use of trainmen in operating trains over it, and if it is negligent in this regard, and by reason thereof a trainman is killed while at his post of duty, the railroad company is liable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 218–223; Dec. Dig. § 112.*]

**4. DEATH (§ 96*)—WRONGFUL DEATH—DAMAGES—STATE LAW.**

Where a railroad engineer was killed in West Virginia owing to the collapse of a portion of the railroad company's roadbed, due to the latter's negligence, an instruction that if plaintiff was entitled to recover the jury should find for her such damages as they might deem fair and just, not to exceed $10,000, was authorized by Code W. Va. c. 103, §§ 5, 6, creating a right of action for wrongful death, and declaring that in every such action the jury may give such damages as they shall deem fair and just, not exceeding $10,000.

[Ed. Note.—For other cases, see Death, Dec. Dig. § 96.*]

**5. MASTER AND SERVANT (§ 217*)—DEATH OF SERVANT—RAILROADS—OPERATION—ASSUMED RISK.**

Decedent, a railroad engineer, who was killed by the collapse of a portion of a fill while he was operating a train over the same at night, did not assume the risk of the safety of the track, unless he knew its dan-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes*

gerous and defective condition, or unless it was so open and obvious that he would be presumed to have knowledge thereof.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 589; Dec. Dig. § 217.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

6. MASTER AND SERVANT (§§ 112, 125, 205*)—INJURIES TO SERVANT—DEFECTIVE ROADBED.

It is the duty of a railroad company to see that its tracks are maintained in a reasonably safe condition, and if a track, though originally constructed in a safe manner, becomes dangerous, and such dangerous condition was not known to an engineer using the track and was not obvious, it did not devolve on him to examine the road, but he could presume that the railroad company had performed its duty, and if it knew or could have known by reasonable care of the unsafe condition of the roadbed, and the engineer was exercising ordinary care when he was killed without knowledge of the defect because of the unsafe condition of the track, the railroad was liable therefor.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 218, 243, 547; Dec. Dig. §§ 112, 125, 205.*]

7. MASTER AND SERVANT (§ 157*)—DEATH OF SERVANT—RAILROADS—NOTICE OF DANGER.

Decedent, a railroad engineer, was killed by the derailment of his engine owing to the collapse of a portion of a fill which had become water-soaked during a freshet. The railroad company for three days prior to the accident had suspended operations over the division in question except for work trains, and on the fourth day, on which decedent was killed, operated trains only under special telegraphic orders. On approaching a station and before reaching the fill, decedent received a telegraphic order informing him that the fill was settling and to "run slow." Defendant's trackmen at the point in question, some time prior to the arrival of decedent's train, had knowledge that the fill was in a dangerous condition and that the earth was washed out under the ties; but no effort was made to protect decedent's train or to give him any further warning of the danger, though this might easily have been done by signal. Held, that decedent's telegraphic order was not such a warning of the danger as to charge him with notice of the dangerous condition of the track.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 303; Dec. Dig. § 157.*]

8. MASTER AND SERVANT (§ 289*)—DEATH OF SERVANT—RAILROADS—CONTRIBUTORY NEGLIGENCE.

In an action for the death of a railroad engineer by the collapse of a fill, whether he violated his orders to "run slow" over the fill held for the jury.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 289.*]

9. MASTER AND SERVANT (§ 278*)—DEATH OF SERVANT—DEFECTIVE ROADBED—CARE REQUIRED.

Where decedent, a railroad engineer, was killed by the collapse of a fill, and there was evidence that the fill was improperly constructed in the first instance, and that, prior to ordering decedent to take a train over the track, the railroad company had knowledge that the fill was sinking and was in a dangerous condition, such facts were sufficient to justify a finding that the railroad company in the exercise of ordinary care should have kept a watchman at that point day and night in order to observe and record any change in the fill and notify the operatives of trains approaching the same of its condition.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

10. MASTER AND SERVANT (§ 185*)—INJURIES TO SERVANT—FELLOW SERVANTS.

Whether a servant, by whose negligence another servant is injured, is a fellow servant, depends on whether the negligent servant was engaged in performing a nonassignable duty of the master or the work of an ordinary servant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 385; Dec. Dig. § 185.*]

11. MASTER AND SERVANT (§ 198*)—DEATH OF SERVANT—RAILROADS—ENGINEER AND TRACK FOREMAN—FELLOW SERVANTS.

Where decedent, a railroad engineer, was killed by the collapse of a fill owing to the negligence of a track foreman employed to superintend the work of maintaining the roadbed and keeping it in proper repair, decedent and such foreman were not fellow servants.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 493–514; Dec. Dig. § 198.*

Who are fellow servants, see notes to Northern Pac. R. Co. v. Smith, 8 C. C. A. 668; Flippin v. Kimball, 31 C. C. A. 286.]

12. MASTER AND SERVANT (§ 265*)—DEATH OF SERVANT—ASSUMED RISK—BURDEN OF PROOF.

In an action for the death of a railroad engineer by the collapse of a portion of the roadbed, the burden of proving assumed risk, and that decedent had knowledge of the extraordinary danger, was on the railroad company.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 892; Dec. Dig. § 265.*]

13. MASTER AND SERVANT (§ 265*)—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.

In an action for death of a railroad engineer by reason of a defect in a track, the burden of proving contributory negligence was on the railroad company.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 893; Dec. Dig. § 265.*]

14. MASTER AND SERVANT (§§ 96, 227*)—DEATH OF SERVANT—DEFENSES—ACT OF GOD—CONTRIBUTORY NEGLIGENCE—INSTRUCTIONS.

In an action for the death of a railroad engineer due to the collapse of a portion of a fill owing to high water, the court properly charged that if decedent's death was caused by an act of God, to wit, the extreme flood and winds causing the fill to settle and become undermined, which condition reasonable care and attention by defendant could not discover or repair, or decedent's death was caused by contributory negligence, or both causes combined, plaintiff could not recover.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 162, 668; Dec. Dig. §§ 96, 227.*]

15. MASTER AND SERVANT (§ 270*)—DEATH OF SERVANT—RAILROADS—OPERATION.

In an action for the death of a railroad engineer by the collapse of a portion of a fill, the court properly charged that if the sons of the watchman in charge of the watch box near the fill were notified of the dangerous condition, and, neither of them knowing of the approaching train, one went to notify his father and the other to notify the telegraph operator, and both acted as promptly as possible to prevent any accident or damage to passing trains, such facts should be considered in connection with the other evidence on the question of the railroad company's negligence.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 270.*]

In Error to the Circuit Court of the United States for the Northern District of West Virginia, at Parkersburg.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by Hettie G. Taylor, as administratrix of Harry B. Taylor, deceased, against the Baltimore & Ohio Railroad Company. Judgment for defendant, and plaintiff brings error. Affirmed.

This is an action instituted by the administratrix of Harry B. Taylor, deceased, against the Baltimore & Ohio Railroad Company in the circuit court of Wood county, W. Va., from which it was removed to and tried in the Circuit Court of the United States for the Northern District of West Virginia: trial resulting in a judgment for the plaintiff, to which this writ of error has been sued out by the defendant company.

The cause of action is based upon the death of the plaintiff's decedent by the alleged negligence and wrongful acts of the defendant company. Taylor was an engineer in the employ of the railroad company. At the time of his death he had been in such employ as engineer more than five years, having been promoted from the position of fireman. He was 33 years old, was a strong, vigorous man, in good health, of temperate habits, and good character, and left surviving him a wife and one child, a boy 2½ years old.

The railroad company at the time was operating among its other lines one extending from Wheeling to Kenova, in West Virginia, a distance of over 200 miles wholly along the banks of the Ohio river. In January, 1907, the operation of this line of road had been greatly impeded by the high waters of this river, and for the three days prior to the 22d of this month operations had been altogether suspended except as to work trains engaged in the repair. On the 22d, however, the waters had so far receded that operations had been resumed and trains were running under special telegraphic orders between the stations of Parkersburg and Point Pleasant, a distance of about 80 miles, in or near the middle of the line. At or about 1 o'clock in the afternoon of the 23d a special train, consisting of an engine, tender, and 27 freight cars, some of which were loaded with steel rails, was ordered out of Parkersburg yard to proceed down the river or south toward Point Pleasant, subject solely to telegraphic orders. Taylor was engineer on this train. His train arrived at Ravenswood, 33 miles below Parkersburg, some time after 6 o'clock, where orders 25 and 67 were received by its conductor and Taylor, the engineer. Order No. 25 directed reduction of speed to 10 miles per hour between certain points set forth, to 6 miles per hour between certain other points, and then set forth: "Fill at bridge just east of Longdale is settling. Run slow. No water at Letart or Spillman." The station of Letart was 16 miles below Ravenswood and was a telegraphic one. When the train arrived there, the white signal was displayed, indicating that its block was clear, no orders were there for it, and that it was at liberty to go head. Some 2½ miles below Letart (sometimes spoken of as south and sometimes west in the record) was a fill, some 150 feet long and 30 feet high, in the deepest place, which had originally been a trestle; but in 1901 a stone or concrete arched culvert had been put in to allow a small stream to pass through, and the place had been then filled with sand, gravel, and other earth material. Backwater from the river through this arch had filled the low ground both above and below this fill to within a few feet of its top. When Taylor's train reached this fill, it was running at a speed variously estimated at between 10 and 15 miles an hour. When the engine went on it, the fill sank, "squashed out," as the witnesses expressed it, the rear of the engine sank down and overturned, killing Taylor, his fireman, and a brakeman who were at the time on the engine.

The allegations in the declaration in effect charge the railroad company with negligence, in that it did not use due and proper care in maintaining this fill and its roadbed there in a safe and proper condition; did not make proper inspection and tests to ascertain its unsafe and dangerous condition; did not employ suitable and sufficient servants to keep and maintain it in such safe condition; furnished to decedent an unusually large, heavy, and unsuitable engine to operate his train upon the then known condition of the roadbed; that with knowledge of the unsafe and dangerous condition of this fill and roadbed it neglected to inform Taylor thereof, as it could have done in time to avoid the accident, but, on the contrary, displayed the white signal

to him at Letart, which directed him in effect to proceed with assurances of safety.

A demurrer to this declaration was entered and overruled by the court below, and the defendant entered a plea of not guilty; its defense being in effect a general denial of liability, an assertion of disobedience of orders by decedent, and contributory negligence and assumption of risk on his part.

A trial by jury was had, a verdict for $10,000 damages rendered, a motion to set aside which was made and overruled, numerous exceptions to rulings of the court and to instructions given and refused were taken, and the case is now here for review upon 22 assignments of error.

B. M. Ambler and J. W. Vandervort (Van Winkle & Ambler, on the brief), for plaintiff in error.

Lewis N. Tavenner (V. B. Archer, on the brief), for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and ROSE, District Judge.

PRITCHARD, Circuit Judge (after stating the facts as above). As appears from the statement of facts, it is insisted by the defendant below: (a) That the evidence was not sufficient to sustain a verdict against the defendant; (b) that the decedent assumed the risk incident to his employment; (c) that his own negligence contributed to the cause of his death.

[1] The first assignment of error relates to the refusal of the court below to direct a verdict in favor of the defendant. The general rule bearing upon this point is well stated in the case of Kreigh v. Westinghouse & Co., 214 U. S. 249, 29 Sup. Ct. 619, 53 L. Ed. 984. In that case the court, among other things, said:

"Questions of negligence do not become questions of law to be decided by a court, except 'where the facts are such that all reasonable men draw the same conclusion from them,' and the case is not to be withdrawn from the jury unless the conclusion follows as a matter of law that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish."

[2] The evidence in this case is such that reasonable men might reasonably differ as to the inferences to be drawn therefrom, and, under these circumstances, we do not deem it necessary to enter into an extended discussion of the facts at this juncture in determining this point, further than to say that a careful consideration of the same leads us to the conclusion that the refusal of the court below to direct a verdict in favor of the defendant was eminently proper.

[3] The second assignment of error is as to instruction No. 2. In this instruction the court told the jury that it was the duty of the defendant company to exercise reasonable care and diligence to make and maintain its track and roadbed in a reasonably safe condition for the use of the engineer in running locomotives over it, and that if the jury believed from the evidence that the defendant company, its agents or servants, had neglected to keep its track, roadbed, and fill in a safe condition, and that by reason of such negligence on the part of the defendant company the plaintiff's decedent was killed by the derailment of his engine while at his post of duty, in the service of the railroad company, then in that event the defendant company would be

guilty of such wrongful act, neglect, and default, and the plaintiff would be entitled to maintain her action, and that the jury should find for the plaintiff such damages as they might deem fair and just, not to exceed the sum of $10,000. The following citations sustain this instruction of the court: Searle v. Railroad Company, 32 W. Va. 370, 9 S. E. 248; Long Pole Lumber Company v. Gross, 180 Fed. 7, 8, 103 C. C. A. 359; Turner v. Norfolk & Western Railway Company, 40 W. Va. 675, 22 S. E. 83; 3 Elliott on Railroads, § 1297, p. 2046.

[4] That portion of the instruction in which the court told the jury that the plaintiff would be entitled to recover such sum as they might deem fair and just, not exceeding the sum of $10,000, was based upon the law of the state of West Virginia. Code of West Virginia, c. 103, §§ 5 and 6, read as follows:

"Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof: then, and in every such case, the person who or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to murder in the first degree, or manslaughter."

"Every such action shall be brought by and in the name of the personal representative of such deceased person; and the amount recovered in every such action shall be distributed to the parties and in the proportion provided by law in relation to the distribution of personal estate left by persons dying intestate. In every such action the jury may give such damages as they shall deem fair and just, not exceeding ten thousand dollars."

While the court instructed the jury that in no event would the plaintiff be entitled to recover a sum in excess of $10,000, yet the question as to the actual amount of damages the plaintiff was entitled to recover, under the pleadings and evidence, was properly left to the determination of the jury.

[5, 6] The third and fourth assignments of error pertain to the rulings of the court below in giving instructions 4 and 5, as requested by the plaintiff. Instruction No. 4 relates to the assumption of risk. The court instructed the jury that when the engineer entered the service of the company he did not undertake to assume the safety of the defendant company's track, roadbed, and fills, unless he knew the defective and dangerous condition, or unless the same were so open and obvious that he would be presumed to have knowledge of them. That he did not by virtue of his contract of employment assume any risk incidental to the use of a defective track, or defectively constructed fill, or defective fill, of which defect he was ignorant, unless such defects and imperfections were open to observation, and in that event he would be presumed to know of them.

The court also instructed the jury that it was the duty of the defendant company to see that its tracks were constructed in a reasonably safe manner and maintained in a reasonably safe condition at the place of the casualty. If the track and fill although originally constructed in a safe manner became unsafe and dangerous from any cause subsequently occurring, and the unsafe and dangerous condition

of the same was unknown to the deceased and was not obvious and open to observation, that it did not devolve upon the deceased to examine and inspect the road and fill to ascertain any defects, but that he had the right to presume that the defendant company had performed its duty in respect to maintaining the tracks and fill in a reasonably safe condition.

In the fifth instruction the court stated to the jury that if they should find from the evidence that the track or fill at the place of the casualty were not kept in a reasonably safe condition for use by the engineer, whose duty required him to use said track at the time he was killed by the derailment of his engine, and further that if they should believe from the evidence that the defendant railroad company knew, or might have known, by the exercise of reasonable care and prudence, of the defective and unsafe condition of the roadbed and fill, and if they should further believe from the evidence that the deceased was exercising reasonable and ordinary care for his own safety at the time he was killed, and that he had no knowledge of the defect and danger, either actually or presumptively, as stated in the fourth paragraph of the instruction, and that his death resulted from the unsafe condition of the track, then the plaintiff would be entitled to recover such damages as the jury might deem fair and just, not exceeding the sum of $10,000.

This instruction very clearly shows the extent to which the deceased assumed the risk incident to his employment, and also properly defines the law as respects the duty the defendant company owed him in the construction and maintenance of its track, and, under these circumstances, we think, is fully sustained by well-established precedents. 4 Thompson, Negligence, §§ 3772, 4261; Long Pole Lumber Company v. Gross, 180 Fed. 7, 8, 103 C. C. A. 359; Patton v. Southern Railway Company, 82 Fed. 979, 27 C. C. A. 287.

[7] It is insisted by counsel for the defendant company that order No. 25, which was delivered to the deceased about two hours before his death, warned him of the risk and danger involved in the trip he was about to make, and that therefore he assumed the same.

It appears from the statement of facts: That at the time this accident occurred the operation of this line had been greatly impeded by the high waters of the Ohio river, and that for three days prior to the time of the accident operations had been altogether suspended except the work trains engaged in repair work. On the 22d the water had so far receded that trains were allowed to run under special telegraphic orders between the stations of Parkersburg and Point Pleasant, a distance of about 80 miles, in and near the middle of the line. That at or about 1 o'clock on the afternoon of the 23d a special train, consisting of an engine, tender, and 27 freight cars, some of which were loaded with steel rails, was ordered out of Parkersburg yard to proceed down the river or south toward Point Pleasant, subject solely to telegraphic orders. The deceased was engineer on this train. When the train arrived at Ravenswood, some time after 6 o'clock, the conductor and engineer received orders Nos. 25 and 67. By order No. 25 the engineer was directed to reduce speed to 10 miles an hour

between certain points and to 6 miles an hour between certain other points. Then appeared the following:

"Fill at bridge just east of Longdale is settling. Run slow. No water at Letart or Spillman."

Notwithstanding the fact that the engineer was directed by this order to run slow at the point where the accident occurred, yet there was no evidence offered by the defendant to show what the words "run slow" were intended to mean. To "run slow" is an indefinite expression, and, in the absence of any evidence as to the interpretation to be given the same, it necessarily follows that the expression means that the engineer is to exercise his own discretion as to the rate of speed he is to run his engine, and this, of course, would depend very much upon the character of the road over which he might be operating his train. For instance, if an engineer should be given instructions to run slow, he would naturally run much slower where the grade was heavy and where slides were likely to occur than he would in a level tract of country where the conditions were altogether different.

It is contended by counsel for plaintiff that, if the defendant company had exercised reasonable care in the inspection of the fill at this place, it could have discovered its unsafe condition, and that had it been in possession of such knowledge it would have limited the speed at that point, so as to avoid the danger to which the engineer was exposed, in the same manner that it did with respect to the other points mentioned in the order, and that therefore the accident was due to the failure on the part of the defendant company to exercise reasonable care in properly inspecting and maintaining its roadbed at this point.

It is admitted that there had been a freshet which had completely submerged the company's track at many points along its line. The fact that the company had ordered its trains run under special telegraphic orders shows that it had knowledge as to the dangerous condition of its track. This was sufficient to put the company upon inquiry as to any defects of construction and any changes that were likely to occur in the condition of the track, and to require at its hands the exercise of reasonable care and caution in maintaining and keeping its roadbed in proper repair.

As we have stated, the deceased assumed the ordinary risk incident to his employment; but, on the other hand, it has been repeatedly held that the servant does not assume any risk occasioned by the negligence of the master except such as are open and obvious or as to the existence of which he has knowledge.

It is alleged in the declaration that the railroad company was negligent, in that it failed to keep the fill at the bridge where the accident occurred in a reasonably safe condition. The duty to keep its roadbed, fills, etc., in good repair and in a reasonably safe condition is imposed upon the master, and this is one of the nonassignable duties—a duty which devolves upon the master at all times, and the failure to perform this duty has invariably been held to be negligence. That the company had notice of the unsafe condition of this fill dur-

ing the early part of the day on which the accident occurred is shown by the evidence. It is true that Section Foreman Finicum testified that he had two or three hands there at work and had done what he could to repair the fill, yet there is evidence which tends to show that the work which was done on that occasion was not of such a character as to strengthen the fill.

A. C. Brown, a witness for the plaintiff, among other things, testified as follows:

"I saw the fill while it was being made. The material of which it was made looked to me like red mud, or red clay. I was there seven or eight times while they were filling it."

Witness Wolf, in referring to the manner of construction of the fill, also testified as follows upon cross-examination:

"About all they had there was some gravel on top of the main arch along this fill. There had been some gravel, and you could just see the red mud from the top. It was not red mud that they put under the ties; the red mud was under that, and they put it there. I stayed up that night to see this train cross there knowing of the water being up, and knowing the conditions of that place it caused me to stay up."

This witness also testified further as follows:

"* * * I was not present when the fill was constructed. I saw it after it was torn down; I could see the material. Never worked at building bridges or fills. I do not speak altogether from the condition of the fill after the train had gone over it. I would not have considered the fill sufficient for a good public road and I have done some road building."

Hiram Rollins, a witness for the plaintiff, also testified as follows:

"I reside at Letart, which is between two and three miles from the fill this side of Longdale. On the night of January 23, 1907, I passed over that fill going down in the forepart of the day near noon, and I came up after night, after the evening train had just passed over. About noon the fill was inundated with water and looked like a part of the track was settling, but the track was out of water from the top of the fill; that is, the rail down to the water, about noon, was about six feet. A couple of men were not far from the fill, Wynn Boston and Clark Ahrnt. They were trackmen; had shovels working on the road. In the evening I had been to Racine, Ohio, after a casket for a child, and was waiting for the evening train. The train did not come. I left the outside box and carried the casket. That is the way I came to walk over there in the dark with it. But the moon was shining. It was light enough to see to walk without a light. The fill at that time was impassable. It had slipped out and left about two rails bare to the side of the track. I had to walk on one side next to the river to keep from slipping down into it. The dirt had left the ties and slipped into the water on the side next to the river. The ties were supported by the earth, if they had any support. I hurried on up to the watchhouse and informed the watchman of the condition of the place, and 'to protect it from life and limb.' I was not a railroader, but I knew he ought to know how to protect that hole when he would find out it was there. I found the watchman and others there. I called for the watchman, and he came to the door. I gave him notice of the fill being out of shape for the train to go over it, and told him to protect it. He failed to do that, or he would have kept the train out of it. I knocked at the door and called for the watchman. He came to the door. There was three or four in there, and he informed who he was, and I told him that the fill was giving away, and to go down and protect it. He started up the road to do something he was told to do. I only told him what I had seen. I didn't know that the train was coming, and I do not know whether he did or not. * * *"

Geo. W. Delinger, a witness for the plaintiff, also testified as follows:

"I had been at the watch box before the accident with Floyd Finicum Henry Delinger, and Henry Finicum. We were having a game of seven-up, playing cards. Hiram Rollins' came along and told us, Mr. Finicum, the watchman, that the fill was out of shape; that it was gone for about two lengths middleways of the ties—that is, that the fill had gone in the river two rail lengths to about middleways of the ties. Finicum said he would go home and tell his father about it. Mr. Finicum was employed as a watchman. He was employed to work on the road and was watching at the time. He said that his father told him if anything happened for him to come and let him know. I told him I would go and tell his father, and he said no, that he would go. His father was section foreman, and this son was acting as watchman. I said to him what if a train comes down while you are gone over there, and he said, 'Let her go to hell.' He went on home up the track : passed our house, and I went on up the track to our house. I was not with him after that. He did not leave a lantern sticking or hanging at the watch box."

Notwithstanding the condition of the fill owing to the recent rains, Finicum made no further inspection at this point after 11:30 a. m., but contented himself by having Mr. Boston go about 6 o'clock in the afternoon, who reported that it was not necessary to have a guard or watchman about the fill. He pursued this course despite the fact that it was his duty as section foreman to keep the track in good repair and to observe any change that might occur at the fill on account of the high waters.

Instead of remaining there or having some one go to the fill at stated intervals to observe any change in the condition of the same, the foreman left his son at the watch box with instructions that "if anything happened to let him know." This young man, in utter disregard of the orders which had been given him by his father, in company with some of the neighbor boys, was in the watchman's house engaged in a game of cards, paying no attention whatever to the condition of the fill. While he and his boon companions were whiling away the hours at a game of cards, the unfortunate engineer was rushing on to sudden death, without the slightest warning or intimation as to the impending danger that awaited him. Before the accident occurred and when the watchman had ample time to flag the approaching train, or go to Letart and notify the agent, he, in company with one of his companions, walked up the track in the direction his father lived, without displaying a lantern or any other signal to indicate the condition of the fill, and made not the slightest effort to stop the ill-fated train. When his companion said to him, "What if a train comes along while you are gone over there," his only comment was, "Let her go to hell."

In dealing with the case of the Long Pole Lumber Company v. Gross, 180 Fed. 7, 8, 103 C. C. A. 365, which is somewhat analogous to the case at bar, this court said:

"If, in approaching the bridge, the engineer saw or could have seen, or had knowledge of, the defective condition of the bridge, then under such circumstances the doctrine of assumed risk would apply. Under the foregoing instruction the question as to whether the plaintiff had knowledge of the

dangerous condition of the bridge was submitted to the jury, and the jury by its verdict determined that question in favor of the plaintiff."

In determining this question, we should keep constantly in mind the distinction between a negligent act of operation and the negligent act of the defendant company in failing to perform its duties of construction and maintenance. In the case of Texas & Pacific Railroad Company v. Archibald, 170 U. S. 665, 18 Sup. Ct. 777, 42 L. Ed. 1188, the court said:

"An employé of a railroad company has a right to rely upon this duty (to furnish safe cars) being performed, as, while in entering the employment he assumes the ordinary risks incident to the business, he does not assume the risk arising from his employer's neglect to perform the duties owing to him with respect to the appliances furnished."

It is true that the engineer was notified that the fill at this point was "settling" and that he must "run slow"; but there was no intimation or suggestion that the fill was likely to give way under the weight of the train. Nor was there any suggestion that at 9 o'clock the condition of the fill was such as to require the presence of the section foreman and his hands, and there was no warning given him by the company to the effect that the fill had become a veritable death trap at the time Rollins passed over it. If the engineer had known the condition of the fill at that time, and he, notwithstanding his knowledge of its condition, had run his train upon it, he would undoubtedly have assumed any risk incident thereto. Instead of the engineer being notified as to the condition of the fill, he was permitted to run his train over the same at a time when he was in utter ignorance as to its condition.

General Superintendent Loree testified that he passed over this fill at 7:30 on the date of the accident. Among other things, he said:

"I did not pay very much or any particular attention to the speed over the fill itself, but I think we were probably going eight or ten miles per hour."

John F. Taylor, engineer on the train on which General Superintendent Loree was riding, testified, among other things, as follows:

"On January 23, 1907, I was on train 719 and passed over this fill east of Longdale at a rate of speed, I judge, between eight and ten miles an hour. Mr. Loree was on that train. There seemed to be nothing wrong with the fill when I went over it. I had this same order No. 25 that day. I passed over this fill between 7 and 7:30. It was dark. I slowed down when I came to it. I am still in the employ of the company."

Here was another train which the defendant company operated under order No. 25, and the engineer in charge testified that when he reached the fill he "slowed down" and only ran at a rate of between eight and ten miles per hour, which is important as throwing light upon what might be termed "running slow" under the order in question.

[8] While some of the defendant company's witnesses testified that the train was running at the rate of 15 miles an hour, yet other witnesses for the plaintiff testified that the ill-fated train was not running over 10 miles per hour at this point. However, in the absence of proof as to what rate of speed could be properly termed "running slow," it

was impossible for the court to give the jury any standard by which it could be guided in determining whether the engineer violated the instructions contained in order No. 25 in attempting to cross the fill. In view of the nature of this order in this respect, it should be borne in mind that there was conflicting evidence as to this point, and the court very properly submitted this matter to the jury for its determination.

There is also evidence tending to show that the fill was not properly constructed in the first instance, and this evidence bearing upon the question as to whether the defendant company properly constructed the same was submitted to the jury by the court below. According to the evidence of witnesses Rollins, Wolf, and Brown, the fill had settled to such an extent that it would have gone down under the weight of cars heavily loaded (as many of them were) regardless of the rate of speed at which the train was running.

In the sixth instruction, to which exception was taken by the defendant, the court instructed the jury that a casualty occurring from a defective track is not one of the ordinary perils which, in presumption of law, the plaintiff's decedent voluntarily assumed when he took service with the defendant railroad company; and that the ordinary care in respect to the safety of its tracks and fills, which the law put upon the defendant railroad company in favor of its servant, varied with the risk or danger; and that the care, in order to be deemed reasonable, must increase as the risk increases, and diminish as the risk diminishes; and that the law exacts an increased degree of care from a railroad company in making provision against the increased risk arising by reason of the railroad being built through lands liable to flood or backwater; and that if they believed from the evidence that the defendant railroad company's track and fill were at the place of the casualty constructed through and upon ground where the track and fill became liable to be affected by floods or backwater, and if they believed further from the evidence that by reason thereof the track and fill became depressed, sunken, and unsafe, and if they believed further from the evidence that the engine on which the plaintiff's decedent was employed as engineer was derailed by reason of the defective condition of the track and fill, and that the plaintiff's decedent was in the exercise of reasonable care on his part, and that by reason of the failure of the railroad company to exercise reasonable care in either constructing its railroad and fill at the place of the casualty in a reasonably safe manner, or in its failure to keep its railroad and track in a reasonably safe condition and repair, then, if they should believe from the evidence that the death of Harry B. Taylor resulted from the unsafe condition of the track and fill, the plaintiff is entitled to recover.

[9] That the defendant railroad company should have exercised great care and caution owing to the condition of its track, roadbed, and fill, as a result of the high waters prevailing at that time, is undoubtedly true. With the knowledge the defendant company had as to the condition of this fill the jury might have found that the company should have kept a watchman at that point day and night in

order that any change in the fill might be observed so as to notify the conductors and engineers of any trains that might be passing over that track while it was in that condition, and the court very properly submitted the question to the jury as to whether the defendant company, under the circumstances, exercised reasonable care and caution in keeping its track, roadbed, and fill at this point in proper repair.

[10] It is also insisted that if there was any negligence it was that of a fellow servant. As we have already stated, the duty of proper construction and maintenance of the roadbed devolved upon the master, and this is a nonassignable duty. In the case of Long Pole Lumber Company v. Gross, supra, this court, in referring to this point, said:

"The rule of the federal court, as I understand it, as to fellow servants, is that, with regard to such employés as we are considering in this case, it depends on what the negligent servant was doing; that is to say, that, if the servant from whose negligence the plaintiff suffers was engaged in performing a nonassignable duty of the master, he is not a fellow servant of the plaintiff."

[11] The court in that case, in his instruction to the jury, correctly stated the law as respects the doctrine of fellow servant. In this instance it was the duty of Finicum, the foreman, to superintend the work of maintaining the roadbed and keeping it in proper repair. It also appears that, independent of the knowledge that Finicum had as to the condition of the fill, the company had actual knowledge of the condition of the same owing to the unusual high waters that had prevailed in that region. Under these circumstances, it cannot be said that the failure on the part of the roadmaster, whose duty it was to properly maintain the same, can be pleaded as a defense to this action upon the ground that it was the negligent act of a fellow servant.

[12] It is also insisted that the court erred in giving instruction No. 7, which is in the following language: .

"The court instructs the jury that the burden of proof as to the assumption of the risk and the knowledge of the extraordinary danger to the plaintiff's decedent, Harry B. Taylor, is upon the defendant railroad company."

It has been repeatedly held that in a case like the one at bar the burden is upon the master to show that the servant knew of the defects or dangerous condition of the track, roadbed, and fill, or that the dangers were so open and obvious that he would be presumed to have had knowledge of them. In the case of Pennsylvania Railroad Company v. Jones, 123 Fed. 758, 59 C. C. A. 892, Judge Gray, in speaking for the court, said:

"The view we take of the case presented by the record, in short, is this: The jury was warranted in finding that the situation maintained by the defendant below at the locus in quo of the accident was not a reasonably safe one, according to the requirements of the law in that behalf, and, as negligence of the master is never one of the risks assumed by the servant, the conclusion that defendant was guilty of negligence, or, in other words, had failed in its duty to decedent, would inevitably follow, unless the affirmative defense is established that decedent was fully informed as to the danger arising from such negligence, or that the same was so obvious that he ought to have been informed thereof; in which case, whether he be said to have assumed the risk, or have waived the negligence of his employer, or to have

been guilty of contributory negligence in voluntarily exposing himself to such danger, the defendant is not liable. The determination of this fact was properly left to the jury, and we are not disposed to criticise the conclusion to which the jury in this case came, much less to say that it was one that should have been set aside by the court below. We cannot say, as a matter of law, that plaintiff was either guilty of contributory negligence, in not abandoning the train and refusing to occupy the station assigned him, or that by remaining there, under the circumstances disclosed by the record, he assumed the risk of the situation created by the plaintiff's default."

The foregoing case is analogous to the case at bar, and, applying the rule announced therein, we are of opinion that the court below did not err in holding that the burden of proof in this respect was upon the defendant.

The next contention is to the effect that the court below erred in giving instruction No. 9 at the instance of the plaintiff. This instruction clearly states the law as to the duty of the plaintiff to maintain its roadbed and keep it in reasonable and safe repair, and the court also instructed the jury that the plaintiff could not recover if they believed from the evidence that Harry B. Taylor was guilty of contributory negligence in remaining on the engine after he knew of the defective and dangerous condition of the track, and in continuing to run the engine over such defective and dangerous portion of the railroad track and fill, or if they believed from the evidence that the defects and dangers were so open and obvious that he would be presumed to have had knowledge of them. Then the court further instructed the jury that contributory negligence on the part of the engineer would not exonerate the defendant railroad company and disentitle the plaintiff from recovery if they further believed from the evidence that the defendant railroad company might, by the exercise of reasonable care and prudence, have avoided the consequences of the plaintiff's negligence.

[13] In instruction No. 10 the court instructed the jury that contributory negligence is a defense, and that the burden of proof upon the issue as to contributory negligence in this case rested upon the defendant railroad company. This instruction is sustained by numerous decisions, especially those of the courts of Virginia and West Virginia, as well as the courts of the United States. In the case of Inland & Seaboard Coasting Company v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270, paragraph 4 of the syllabus is in the following language:

"That the burden of proof was on the defendant to show that the plaintiff was negligent, and that his negligence contributed to the injury."

In the case of Hough v. Railway Company, 100 U. S. 213, 25 L. Ed. 612, Justice Harlan, in speaking for the court, said:

"* * * That the engineer knew of the alleged defect was not, under the circumstances, and as a matter of law, absolutely conclusive of want of due care on his part. Ford v. Fitchburg Railroad Company, 110 Mass. 261 [14 Am. Rep. 598], Laning v. N. Y. C. Railroad Company, 49 N. Y. 521 [10 Am. Rep. 417]. In such a case as that presented, the burden of proof to show contributory negligence was upon the defendant. Railroad Company v. Gladmon, 15 Wall. 401 [21 L. Ed. 114]; Wharton, Negligence, § 423, and authorities there cited in note 1; Indianapolis & St. Louis Railroad Company v. Horst, 93 U. S. 291 [23 L. Ed. 898]."

It is insisted that the court erred in giving instruction No. 11. This instruction relates to the duty the railroad company owed the deceased in giving notice of the increased danger. An examination of the same leads us to the conclusion that it was not prejudicial to the rights of the defendant railroad company.

[14] In instruction No. 14 the court instructed the jury that if they should find from the evidence that the death of the plaintiff's decedent was caused either by the act of God, to wit, the extreme flood and winds causing said fill near Longdale to settle and become undermined, which condition reasonable care and attention by the defendant could not discover or repair, or that said death was caused by the contributory negligence of the plaintiff's decedent or by the two causes combined, to wit, by contributory negligence of plaintiff's decedent, and by extreme flood and winds, and was not caused by the negligence of the defendant company, then the jury must find for the defendant.

We think the court fairly presented the two propositions to the jury and very properly left the same to its determination.

[15] In instruction No. 15 the court instructed the jury that if they should find from the evidence that Floyd Finicum and his brother, Harry, were notified at the watch box in what is known as the Narrows about a mile west of Letart, by Rollins about 8 p. m. that the fill east of Longdale was settling, and at that time said Finicum was watchman at the Narrows, and that neither of them knew of the approaching train, but that one of them went within a few minutes to notify John Finicum, section foreman, and the other to notify the operator at Letart, and that both parties acted as promptly as possible to prevent any accident or damage to passing trains, all of these facts should be considered by the jury in connection with all the other evidence in the case, upon the question of negligence or want of care upon the part of the defendant company.

We think that the court very properly submitted this phase of the question to the jury to be considered by it along with the other questions involved in this controversy.

We have carefully examined and considered the cases relied upon by the plaintiff in error; but we are of opinion that the facts of this case are such that those decisions do not apply to the questions involved herein.

An examination of the assignments of error as to the refusal of the court below to give certain instructions and modify those given leads us to the conclusion that there is no prejudicial error.

When we consider the peculiar circumstances surrounding this case and the many interesting points involved, we are impelled to the conclusion that by the trial of this case substantial justice has been obtained.

For the reasons herein stated, the judgment of the lower court is affirmed.