558 A.2d 768

**POTOMAC ELECTRIC POWER COMPANY**

v.

**Doris J. SMITH, et al.**

**No. 1395, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

June 8, 1989.

594

Kevin J. McCarthy (Catherine A. Cronin and McCarthy, Bacon, Costello & Stephens, on the brief) Landover, for appellant.

Paul D. Bekman, Scott R. Scherr, Baltimore, John J. Sellinger of Rockville, and Bill Wagner of Tampa, Fla., for amicus curiae, Association of Trial Lawyers of America and The Maryland Trial Lawyers Ass'n.

J. Joseph Curran, Jr., Atty. Gen., Judson P. Garrett, Jr., Deputy Atty. Gen., Kathryn M. Rowe and Robert A. Zarnoch, Asst. Attys. Gen., for amicus curiae, State.

David P. Sutton of Washington, D.C. (Steven M. Cooper, Douglas J. Adams and Steven M. Cooper, Chartered, Silver Spring, on the brief for appellees, Smith and the Estate of Chrisianthia Lambert).

(Gary R. Alexander and Jay R. Goldman and Alexander & Cleaver, P.A., Fort Washington, on the brief, for appellee, George Calvin Lambert).

Argued before WILNER, ALPERT and BLOOM, JJ.

ALPERT, Judge.

Almost a century ago, it was observed that "electricity is the most powerful and dangerous element known to science; it cannot be seen, and it is as silent as it is deadly...." *Overall v. Louisville Elec. Light Co.*, 47 S.W. 442, 443–44 (Ky.1898)[1]. The electrocution of fifteen-year-old Chrissy Lambert by the force of an errant 7600 volt power line begat judgments against the Potomac Electric Power Company ("PEPCO" or "the Company") in the total or aggregate amount of $7,852,000. Those judgments spawned this appeal, which presents us with a number of interesting yet perplexing legal issues.

## Facts

On September 20, 1986, fifteen-year-old Chrisianthia Lambert was electrocuted when she came in contact with a 7600 volt electric power line owned by PEPCO. The accident occurred on a path located in the Hil–Mar area of Forestville in Prince George's County.

PEPCO does not own the land where the accident occurred, but it had acquired from the owners an easement giving it the right to install, erect, and maintain in, on, over or under the area, all electrical transmission and distribution equipment necessary to serve its utility customers. The easement further provides that the owners of the land may use the right-of-way easement for ingress and egress to other lands owned by them, provided they first notify PEPCO in writing of this use and PEPCO grants permission. Although under the terms of the easement the Company had the right to restrict ingress and egress through the easement, PEPCO did not exercise that right. There were no signs prohibiting use of the right-of-way path; nor were there any gates or fences around the area preventing the public from using the right-of-way. A fair reading of the evidence indicates that the general public was at least

---

1. To be sure, this observation pre-dates the discovery of the devastating effects of radiation and radioactivity.

tacitly permitted to use the right-of-way path and did use it without any restriction. Testimony elicited at trial revealed that the path was regularly used by children and adult residents of the neighborhood for jogging, riding of motor bikes, walking of dogs, and travel to and from different locations in the area, including the Andrew Jackson Middle School, to which the path directly leads.

The accident was caused by a power line carrying 7600 volts of electricity. The power line was suspended between two utility poles about 500 feet apart. According to PEP-CO, it was required by the National Electrical Code to maintain the power line at least 25 feet above ground; however, at the time of the accident the power line had fallen to about 2 or 3 feet above ground for a distance of about 20 to 25 feet in close proximity to the adjacent pathway. As thus positioned, it was variously described by eyewitnesses as a "dull gray" object resembling a "rope," a "rope covered with dust," a "railing" and an "ordinary cable." Police officers and a paramedic who responded to the scene were unable to recognize the downed power line as such when they first observed it, and they did not become aware of its dangerous character until further inspection traced it to the two poles to which it was attached.

The power line fell because a cross-arm to which it was attached broke. According to the testimony of James Taylor, a timber product specialist, the cross-arm should have been rejected at the time of installation in 1964 because of the excessive number of knots in the wood. He further testified that approximately ten years before the fatal accident the cross-arm should have been replaced when one side of it broke, but that the company chose instead to refasten the overhead power lines to its opposite side. It was this side that broke in 1986, causing the power line to fall.

According to the testimony of various witnesses at the trial, PEPCO was on notice of the fallen power line prior to the accident. Wendell Corbin, an electrician who lived in the neighborhood, testified that on or about August 17,

1986 he saw the fallen power line while walking his dog along the path. He testified that he examined the power line with a "static probe" that he carried in his pocket and discovered that electricity was running through it. He then called PEPCO, reported that a live power line was down, gave the location of the power line, and further advised PEPCO that the power line was in an area frequented by children. He was told that the company would take care of it. PEPCO has no record of this call.

Another neighborhood resident, Gregory Joseph Fuller, testified that on September 7, 1986, some neighborhood children told him that a power line was down behind his house. He walked down the path behind his house and saw a power line sagging about two feet above the ground. He testified that he immediately went home, called PEPCO, and told the company that a power line was down. He gave the operator the location of the downed power line and told her that it was located in an area that children used all the time. He also gave PEPCO his phone number for call-back purposes. The operator allegedly asked him what the pole number was, but he could not give her that information. She told him that someone from PEPCO would be there to repair it. PEPCO has no record of this call either.

PEPCO did acknowledge that on September 17, 1986, it received a complaint from a Mr. Turner about a power line down and burning in the Hil–Mar area at the end of the apartment projects along a dirt road. The company dispatched a repair truck to the area. Mr. George Nicholas Pappas, a lead line mechanic for PEPCO, testified that he was sent to investigate the complaint on September 17, 1986. According to his testimony, he alighted from the truck and commenced inspection of the area. He walked along the path, but did not go as far down as where the accident later occurred because some youths who were further down the right of way path threatened to hurt him if he got closer. He did not radio the police for assistance, but got back into the truck and drove around the area looking for the downed power line. He then notified the

dispatcher that he was unable to find it. In a complaint resolution form, however, Mr. Pappas reported that he "checked the right-of-way" path and "found (it) okay." When questioned about this, Mr. Pappas testified that later that evening he found a power line draping low over a construction trailer in the same neighborhood and thought he had discovered the power line that was the subject of the earlier complaint. This power line, however, was neither down nor burning. As a result, the live power line remained undetected by PEPCO until the day of the fatal accident.

On September 20, 1986 fifteen-year-old Chrissy Lambert, the decedent, and Janea Stanford, a friend she had recently met, walked along the path located on PEPCO's right-of-way easement to a nearby shopping mall. On their way back that afternoon, Ms. Lambert came into contact with the downed power line and was electrocuted. Ms. Sanford testified that the decedent was walking about two feet behind her, to her right, at a point close to the downed power line near the edge of the path. They were engaged in conversation during their walk back, and following a conversational pause Ms. Sanford heard a buzzing noise, looked back, and saw Ms. Lambert lying on the ground with her body shaking and her left arm extended up to the power line. The power line was emitting sparks at the point of contact. She ran home and told her parents.

Deborah Fiedler, a paramedic who treated the decedent at the scene, testified that she observed that Ms. Lambert had burn marks on her left arm near the elbow, her left leg, and her left buttock area. According to Ms. Fiedler, the largest burn was a third-degree burn on the left arm. Ms. Lambert had less severe burns on her right hand.

Two other witnesses testified as to the burns on Ms. Lambert's body. Ray Martin, an electrical engineer specializing in electrical injury investigations, concluded, from the photographs admitted into evidence, that the burns on the left arm were caused by direct contact with the fallen power line. In Mr. Martin's opinion, the burns on the left

buttock and left leg were electrical burns, but they were not caused by direct contact with the power line.

Dr. Dennis Smyth, an Assistant State Medical Examiner who performed the autopsy, testified that Ms. Lambert sustained target burns on her right hand and left buttock area. He testified that target burns are "frequently seen at the site of electricity entering the body."

On the basis of all the testimony heard and the evidence admitted, the jury awarded the estate of Ms. Lambert $2,000 as compensatory damages and $7,500,000 as punitive damages. The jury awarded the parents of Ms. Lambert, Doris Smith and George Lambert, $500,000 in their wrongful death action. Thereafter, the court granted PEPCO's motion to limit the wrongful death damages under Section 11–108 of the Courts and Judicial Proceedings Article, which placed a ceiling of $350,000 on the amount of noneconomic damages recoverable in personal injury actions. Appellant then filed several post-judgment motions, and following a hearing in which these motions were denied, PEPCO noted its appeal. Thereafter, appellees filed their cross-appeal. The issues raised in these appeals are discussed *infra*.

I. What standard of care did PEPCO owe to Ms. Lambert?

█ PEPCO contends that the trial court erred in essentially instructing the jury "that the standard of care owed to the decedent in this case was one of reasonable care." [2]

---

**2.** The trial court specifically advised the jury as follows:

In this case, I instruct you as a matter of law that a power company who creates or maintains power lines on land, which they should, or which they recognize, or should recognize as involving an unreasonable risk of physical harm to others who are upon that land, is subject to responsibility for any physical harm that is caused to these persons if, number one, these power lines were created in a negligent and in a careless manner, or maintained, or secondly, maintained in a negligent and in a careless manner. In order for you to fix responsibility, however, of number one, improper creation or, secondly, improper maintenance, the power compa-

PEPCO's reading of the instruction is too narrow. In qualifying its instruction on the "negligent creation" or "maintenance" of the power lines, the court told the jury that in order to impose liability it must find that "the power company ... has some kind of knowledge of the defect or unsafe condition before the accident occurred in sufficient time to ... correct ... the defect and to warn anybody that was on the land...." That language is not inconsistent with the applicable law as discussed *infra.*

PEPCO further argues that because the decedent was a trespasser, the court should have instructed the jury that the only duty it owed decedent was to refrain from willfully or wantonly injuring her.[3] PEPCO correctly points out that in Maryland it has long been established that generally a possessor of land only owes a trespasser or a bare licensee the duty to refrain from willfully or wantonly injuring such person.[4] *Murphy v. Baltimore Gas & Electric Co.,* 290

---

ny must have had some kind of knowledge of the defect or the unsafe condition before the accident occurred in sufficient time to, number one, either correct the deficiency or the defect, and secondly, to warn anybody that was on the land, lawfully on the land. The power company is considered to have had such knowledge when the defect or the unsafe condition is such that it could or should have been discovered by the exercise of what we lawyers call ordinary or due care.

**3.** PEPCO took exception to the trial court's failure to instruct the jury that

the defendant owed no duty to the decedent other than to abstain from willfully and wantonly injuring or entrapping the decedent.
 I would further except to Your Honor's refusal to instruct the jury as to what the status of this young girl was on the property in this particular case. We have someone who obviously is on property, who is injured on property, we have no idea what her status is, whether she is a bare licensee, whether she is a trespasser. I believe that Maryland requires that everyone be categorized and everyone be put in a category, because the duties of those on the property, using the property, whether they be owner of an easement or owner of the property depends on the status of the person on the property. In this particular case, the jury doesn't know what her status is. I suggest the only status she had was that of trespasser.

**4.** This standard is commonly referred to as the "Massachusetts rule." *See Carroll v. Spencer,* 204 Md. 387, 393–394, 104 A.2d 628 (1954). It

Md. 186, 428 A.2d 459 (1981); *Bramble v. Thompson*, 264 Md. 518, 287 A.2d 265 (1972). Recently, the Court of Appeals in *Wagner v. Doehring*, 315 Md. 97, 553 A.2d 684 (1989), applied this standard of care to an easement holder who exercises control over the easement as a land owner.[5]

---

stems from the old common law principle that "it is considered a socially desirable policy to allow a man to use his land in his own way, without the burden of watching for and protecting those who come there without permission or right." Prosser & Keeton on *Torts*, § 58, at 395 (5th ed. 1984 & Supp.1988). The possessor of land, however,

"was not free to inflict unreasonable intentional injury upon his unwelcomed visitor. The trespasser, while he may be a wrongdoer, is not an outlaw, and an intentional unprivileged battery upon him was too much to be tolerated even by the great veneration of the English courts for rights in land. The defendant was not permitted to set traps for the trespasser, or to use unreasonable force to expel him from the premises. Nor, in later cases, was he allowed to injure him negligently by an act specifically directed toward him, or recklessly by conduct in conscious disregard of his peril."

Prosser, § 58 at page 397. *See* Footnote 85; *Pridgen v. Boston Housing Authority*, 364 Mass. 696, 308 N.E.2d 467 (1974). (Court modified the "Massachusetts rule" and held that the same common duty of reasonable care is owed by an owner to a trespasser who has become helplessly trapped on the premises to the owner's knowledge). *See also Romana v. Boston Elevated Ry. Co.*, 226 Mass. 532, 116 N.E. 218 (1917); *Magar v. Hammond*, 183 N.Y. 387, 76 N.E. 474 (1906); *Aiken v. Holyoke St. Ry. Co.*, 184 Mass. 269, 68 N.E. 238 (1903); *Palmer v. Gordon*, 173 Mass. 410, 53 N.E. 909 (1899).

5. In *Wagner, supra,* the court held that the easement holders who "exercise a degree of control over the land which permits the holder to exclude trespassers from the easement" was entitled to the same immunity from liability as the landowner. The rationale behind this limited liability is that under the common law the liability incurred in protecting one's property is closely allied with the privilege to protect that same property. An owner is privileged to use reasonable force to protect his property from others. He may not, however, use excessive force in defending his property. There is no privilege to use a degree of force calculated to cause death or bodily injury. As Professor Prosser noted:

"In certain situations, there may be no privilege to use any force at all to expel an intruder. Just as the Defendant may not kill a trespasser to eject him, he will not be exposed to serious danger or physical harm. A tramp on a railway train may not be thrown off at 40 miles an hour, nor may a trespasser who is ill and unable to look out for himself be thrust out on a winter night, unless his illness is of a contagious character which threatens the inmates of

Electric companies, as owners of property, have generally, under most circumstances, been held to the same duty of care to trespassers as landowners. *See, e.g., Murphy, supra; Dageforde v. Potomac Edison Co.*, 35 Md.App. 37, 369 A.2d 93 (1977). *But see Eastern Shore P.S. Co. v. Corbett*, 227 Md. 411, 177 A.2d 701 (1962) (the amount of duty and care of a power company depends on the amount of danger involved, the "greater the danger, the greater the vigilance required to measure up to the standards of ordinary care").[6]

Nevertheless, we believe that nationwide there have emerged certain well accepted principles applicable to limited situations involving power companies that have, thus far, never been addressed by Maryland appellate courts, *i.e.*, a power company is subject to liability for bodily harm to trespassers when the following factors coalesce:

1. The company knows, or should know, that trespassers constantly intrude upon a limited area of the land;

---

the house. The necessities of the situation create a privilege to remain, but prevails over the vindication of the property right." Prosser, § 21 at page 134.

In the instant case, it is arguable that PEPCO should not be extended the same immunity from liability as a landowner because it never exercised control over the easement, although it had the legal right to do so. *See Prosser,* § 58 at page 395. (the rule that a landowner owes no duty to a trespasser other than to avoid willfully or wantonly injuring him will not be extended "to other defendants who are not in possession of the land.")

**6.** In some jurisdictions an electric company that owns an easement to maintain and operate its power lines is held to a higher standard of care to trespassers, *ie.*, it owes a duty of ordinary care to the trespasser. *See, e.g., Allen v. Texas & Pacific Ry. Co.*, 430 F.2d 982 (5th Cir.1970); *Blackwell v. Alabama Power Co.*, 275 Ala. 123, 152 So.2d 670 (1963); *Jackson v. Utica Light & Power Co.*, 64 Cal.App.2d 885, 149 P.2d 748 (1944); *Langazo v. San Joaquin Light & Power Corp.*, 32 Cal.App.2d 678, 90 P.2d 825 (1939); *White v. Mississippi Power & Light Co.*, 196 So.2d 343 (Miss.1967); *Smith v. Southwest Missouri R. Co.*, 333 Mo. 314, 62 S.W.2d 761 (1933); *Cole v. Duke Power Co.*, 81 N.C.App. 213, 344 S.E.2d 130 (1986); *Earl W. Baker Utilities Co. v. Haney*, 203 Okl. 91, 218 P.2d 621 (1950); *Texas–Louisiana Power Co. v. Webster*, 127 Tex. 126, 91 S.W.2d 302 (1936). *See also* Restatement (Second) of Torts, Section 383, and Illustration 1 (1965).

2. The company maintains a highly dangerous condition in that area;

3. The dangerous condition is likely to cause death or serious bodily harm to such trespassers;

4. The condition is of such a nature that the company has reason to believe that such trespassers will not discover it; and

5. The company has failed to exercise reasonable care to warn trespassers of the condition and risks involved.

*See* Restatement (Second) of Torts, Section 335 and comment d, and Illustration 1;[7] *Cornucopia Gold Mines v. Locken,* 150 F.2d 75 (9th Cir.1945) (defendant owed decedent duty of ordinary care which defendant negligently failed to exercise when it failed to repair a high-voltage electric transmission power line that sagged on the ground, thereby causing decedent, a person it should have known would go on the property, to die when she came in contact with the power line); *Scott v. Claiborne Electric Cooperative,* 13 So.2d 524 (La.App.1943) (Defendant liable for negligence in failing to exercise proper care of its 7,200 volt power line which had fallen and was the cause of decedent's death when he came in contact with it. The Louisiana Court of Appeals held that defendant was liable not only to persons who had a right to be on the property but "also to persons who defendant should reasonably have anticipated might be present and exposed to danger ... although (such persons were) without technical right to be at such places." *Id.* at 531); *Markovich v. Jefferson Coal & Coke Corp.,* 146 Pa.Super. 108, 22 A.2d 65 (1941) (when defendant main-

---

**7.** Illustration 1 to Section 335 provides an example dealing with a power company's liability to a trespasser. It states:

1. A, knowing that persons are in the habit of trespassing upon his land at a point close to his unfenced powerhouse, permits a high voltage electric wire, strung at a height of five feet and so concealed by vegetation as to be difficult of observation, to become uninsulated. B, a trespasser, wanders from the adjacent part of the land into the yard of the powerhouse and comes into contact with the wire. The contact causes B's death. A is subject to liability for B's death.

tained high voltage uninsulated electric wires above a path which it had permitted people to pass for many years, it became liable for damages due to the death of a 16 year old boy who was electrocuted when he came in contact with a fallen power line along the path); *Dillon v. Twin State Gas & Electric Co.*, 85 N.H. 449, 163 A. 111 (1932) (utility company was warned by its construction engineer that boys frequently played on the bridge in proximity to its wires, based on this evidence the court found that it had knowledge of frequent trespassers on its property and, therefore, had violated its duty of care to the injured plaintiff who came in contact with its wires). *Cf. Bennett v. Public Serv. Co. of New Hampshire*, 542 F.2d 92 (1st Cir.1976) (evidence was insufficient to show that utility company knew or should have known of trespassers on pole; therefore, utility owed no duty of care to the injured plaintiff); *Blavatt v. Union Electric Light & Power Co.*, 335 Mo. 151, 71 S.W.2d 736 (1934) (evidence insufficient to show that defendant knew or should have known that boys were in the habit of climbing over a wall which surrounded its transformer and, therefore, defendant owed them no duty other than to refrain from willfully injuring them). In *Markovich, supra,* the Supreme Court of Pennsylvania, holding that "maintaining a high voltage electric power line is required to exercise the highest degree of care practicable," noted that:

> "the salutary and well settled rule in this Commonwealth is that one using a dangerous agency or instrumentality is bound to exercise care commensurate with the danger."

*Id.,* 22 A.2d at 67. *See also* 5 F. Harper, F. James & A. Gray, *The Law of Torts,* § 27.3 at 151–54 (2d ed. 1986). We believe that these principles are sound ones that, upon close examination, are not inconsistent with established Maryland law.

The Court of Appeals in *Eastern Shore v. Corbett, supra,* a case involving personal injury arising from the negligent use of electricity, stated the standard of care to be as follows:

"The primary rule relative to the diligence required of electric companies, running through all the decisions, is that they must observe such care as is commensurate with the danger involved. Thus, many cases, considering the term 'ordinary care' as a relative expression (meaning commensurate, due, or proper care under the circumstances), have used the same in describing the obligation of electric companies, even when high pressure currents were under consideration.

* * * * * *

The test to be applied is whether the Defendant exercised such care and caution as a reasonably prudent man would have exercised under all of the surrounding circumstances of the case, with the *amount* of care and caution corresponding to the capacity to injure, so that the greater the danger, the greater the vigilence required to measure up to the standards of ordinary care."

*Id.* [227 Md.] at 425–26, 177 A.2d 701 (original emphasis) (citations omitted).

The fact that the company knows or should know that trespassers constantly intrude upon a limited area of the land is of critical significance. That factor when considered along with the remaining enumerated principles contemplates that the company knows or should know of the presence of the trespasser and that the trespasser may be in imminent danger of serious bodily harm. The Court of Appeals in *Carroll v. Spencer*, 204 Md. 387, 394, 104 A.2d 628 (1954) stated the generally accepted proposition that:

"... the owner of land in Maryland owes no duty with respect to the condition of his land to the trespasser, or even to a licensee, whose presence upon the land is known to him, except to abstain from willfull or wanton misconduct."

The court went on to hold "that the appellee had no actual knowledge of a real and imminent peril of the trespasser, or bare licensee, and that this being so, owed him no duty under the facts of the case." *Id.* at 396, 104 A.2d 628.

Thus, we conclude that the "actual knowledge of a real and imminent peril of the trespasser" places a duty upon the possessor of land that it may not theretofore have had immediately before acquiring that knowledge. Again we note that the trial court's instruction predicated liability on knowledge of the unsafe condition and time to either correct it or warn "anybody that was on the land." This certainly suggests that before PEPCO would be liable it must have foreknowledge of "anybody on the land."

This case presents a confluence between the duty of a power company using a dangerous instrumentality to exercise care commensurate with the danger and the duty that a power company owes to the trespasser once it recognizes that the trespasser is imminently in the path of that danger. We emphasize that the principles espoused by PEPCO, while unassailable under the facts of the cases cited, have never been applied in Maryland to a case similar to the one *sub judice* simply because the Maryland appellate courts have never been exposed to a case quite like the instant one.[8]

Applying the law recited above to the facts of this case, we hold that PEPCO owed the decedent the duty commensurate with the danger involved once it knew or should have known of her presence. The company knew it was operating a highly dangerous instrumentality (high voltage electric power lines). It is also common knowledge that if a person comes in contact with a live high voltage electric wire, he will suffer death or serious bodily harm.

According to PEPCO, a complaint from a customer about a fallen power line is a Priority 1 complaint, *i.e.*, one involving a life-threatening emergency. Mr. Henry J. Pulizzi, a manager at PEPCO's transmission and distribution department, testified that it is PEPCO's policy that when it receives a call that a transmission line has fallen and is two feet off the ground, hot and burning, in an area that

---

**8.** See appendix.

children frequent, the company would arrive at the scene within 10–15 minutes and the electricity could be cut off in a matter of minutes. In the instant case, there was evidence that PEPCO received at least three complaints over a one month period about a "hot" or down and burning wire on their right-of-way easement, and that it was aware that people in the neighborhood, including children, often used the path located on its right-of-way easement. Yet PEPCO permitted this dangerous condition to continue uncorrected. Under these circumstances, PEPCO was under an obligation to exercise that degree of care commensurate with the degree of danger that it knew or should have known existed.

Even if the standard of liability were that proffered by PEPCO, it still would not prevail for there was abundant evidence, apparently credited by the jury in its award of punitive damages, of PEPCO's willful and wanton conduct. Under the facts of the case *sub judice*, conduct that would support the imposition of punitive damages is conduct that would breach the duty of care owed to a trespasser.

A landowner in Maryland will not be held liable for the injury of a trespasser unless the landowner willfully or wantonly injured the trespasser. *Mech v. Hearst Corp.,* 64 Md.App. 422, 426, 496 A.2d 1099 (1985), *cert. denied,* 305 Md. 175, 501 A.2d 1323 (1986). Similarly, a jury cannot award punitive damages unless they find that the defendant's conduct amounted to a wanton or reckless disregard for the rights of others. *Medina v. Meilhammer,* 62 Md. App. 239, 249, 489 A.2d 35, *cert. denied,* 303 Md. 683, 496 A.2d 683 (1985). "Willful and wanton" has been defined in both contexts as "conduct that is extreme and outrageous, in reckless disregard for the rights of others." *Mech, supra,* 64 Md.App. at 428–29, 496 A.2d 1099; *Medina, supra,* 62 Md.App. at 248, 489 A.2d 35. *See also Harris v. Buckeye Irrigation Co.,* 131 Ariz. 540, 642 P.2d 885, 889 (1982); *Romana v. Boston Elevated Ry Co.,* 226 Mass. 532, 116 N.E. 218 (1917).

In *McLaughlin v. Bardsen,* 145 P. 954 (Mont.1915), a case cited with approval by the Maryland Court of Appeals in *Wagner, supra,* the Supreme Court of Montana reviewed the duty a landowner owes a trespasser and the type of actions that would constitute willful and wanton misconduct. In *McLaughlin,* a woman was injured when she fell into a trench dug by the defendant. The court stated:

The rule at common law imposed upon the landowner the duty only to refrain from any intentional or wanton acts occasioning injury to a trespasser upon his property. *Egan v. Mont. C. Ry. Co.,* 24 Mont. 569, 63 Pac. 831; *Conway v. Monidah Trust,* 47 Mont. 269, 132 Pac. 26. The exceptions to that rule are not material here. Since these defendants were in possession of the land at the place of injury and had an easement in the property, they are to be treated as the owners for the purposes of these appeals. That wantonness may be shown by acts of omission as well as by acts of commission, where the facts disclose a reckless disregard of the lives or safety of others, is a rule of law now generally recognized and was referred to approvingly by this court in *Driscoll v. Clark,* 32 Mont. 172, 80 Pac. 1, 373.... Tested by that rule, the evidence discloses that the path or roadway, where the accident happened, was so plainly marked on the ground and had been subjected to such general and notorious use, and for such length of time, that the defendants knew of its existence and use, or, what amounts to the same thing, will be held chargeable with that knowledge. The facts, then, disclose uninclosed lands over which the public (that is, the people of a considerable community or neighborhood) had been accustomed to pass for several years, until a well-defined path or roadway had become plainly marked upon the ground, and the owners of that ground excavating a dangerous trench into or across such path or roadway, and leaving the same uncovered, unguarded, and unprotected for two or three weeks, without warning or notice of any kind or character, and with the knowledge that people accustomed to use the path or

roadway might reasonably be expected to use it under such circumstances that injury to them would result. If this does not make out a prima facie case of reckless disregard of the lives and safety of others, then it would be difficult to imagine a state of circumstances which would do so.

In the case at bar, given the evidence that PEPCO was on notice for about a month that its power line was down and its awareness that adults and children had been accustomed to traversing the area, its failure to repair the downed wire was sufficient evidence to support the jury's finding of wanton and willful misconduct. See our discussion of punitive damages—implied malice, *infra*, section III.

In a majority of cases decided outside of Maryland, the courts have held that a utility company is guilty of willful and wanton conduct when it knowingly fails to install, maintain, or repair its facilities properly. For example, in *Beavers v. West Penn Power Co.*, 436 F.2d 869 (3d Cir. 1971), decedent, a ten-year-old boy was electrocuted when he climbed a tree on his parents' property and came in contact with a high tension wire that was strung on poles owned by Bell Telephone Company of Pennsylvania. The Court of Appeals for the Third Circuit held that evidence that the company knew for a long time that their electric pole was tilting towards decedent's parents' property, and yet did nothing because it thought a tilt of 2 feet 5 inches was not excessive, would justify a finding of wanton misconduct.[9]

---

9. A similar case arose in Maryland in *Dageforde v. Potomac Edison Co.*, 35 Md.App. 37, 369 A.2d 93 (1977). There, a twelve-year-old boy was injured when he came in contact with a 7200 volt power line. His parents alleged that the power company had negligently placed an electric pole too close to a tree. Evidence produced at the trial showed that the boy received the injury either when he climbed the electric pole or when he climbed a tree located near the pole. The trial court found that in order to recover, appellants had to prove the accident occurred while the boy was in the tree. Because they did not establish this, the trial court ruled, and we affirmed, that they could not recover. *Id.* at 42, 369 A.2d 93.

In *Cornucopia, supra,* the owner of a high-voltage electric transmission line negligently failed to repair it and allowed it to sag near and on the ground so that anyone who walked near or over it would likely come in contact with it and be thereby injured. The Court of Appeals for the Ninth Circuit held that under these circumstances the owner was guilty of reckless and wanton conduct without regard to whether the one injured was a trespasser. *Id.* at 77.

The Illinois Court of Appeals in *Spence v. Commonwealth Edison Co.,* 34 Ill.App.3d 1059, 340 N.E.2d 550 (1976), held that evidence that defendant power company had reasonable notice that a substantial danger existed in placing its lines close to a private antenna, combined with its failure to inspect the site, insulate the wires, give warning, or take any precaution after receiving notice, was sufficient to support a charge of willful and wanton conduct. *Id.,* 340 N.E.2d at 557. *See also Kulhanjian v. Detroit Edison Co.,* 73 Mich.App. 347, 251 N.W.2d 580 (1977) (evidence that there was 125 feet of extra high voltage wire between two poles, and the utility company was aware of the sag but never corrected it, and that they knew that the building under which the wire was sagging was going to be demolished and workmen would be near the overhead wires, was sufficient to support plaintiff's theory that defendant was guilty of willful or wanton misconduct).

In the case before us, we hold that the jury was given sufficient evidence to find PEPCO guilty of willful and wanton misconduct and, therefore, PEPCO was liable for the decedent's death.

II. Was Ms. Lambert guilty of contributory negligence and/or assumption of the risk as a matter of law?

 PEPCO contends that the trial court erred in allowing the jury to decide whether decedent was guilty of

contributory negligence.[10] The company claims that the court should have determined as a matter of law that decedent was contributorily negligent. Appellees, of course, extol the virtues of the trial court's decision.

As a general proposition, questions of primary and contributory negligence are for the jury to determine. *Conowingo Power Co. v. State of Maryland*, 120 F.2d 870, 874 (4th Cir.1941); *Hooper v. Mougin*, 263 Md. 630, 284 A.2d 236 (1971); *Diffendal v. Kash and Karry Service Corp.*, 74 Md.App. 170, 536 A.2d 1175 (1988); *Robertson v. Shell Oil Co.*, 34 Md.App. 399, 403, 367 A.2d 962 (1977). PEPCO argues, however, that because the possibility of receiving an injury from touching a live electric wire is so well known, people are expected to take proper precautions to prevent such injury, and will be held as a matter of law contributorily negligent when they do not use ordinary care and come in contact with the wire. *Southern Maryland*

---

**10.** On the issue of contributory negligence, the trial court specifically instructed the jury that:

[U]nder our law, if a person who is injured by the acts of someone else contributes to her own injury that is, she is contributorily negligent, we don't allow that person to recover any damages. And when we use this term, contributory negligence, all that we mean is that the plaintiff in this case, or, rather, the deceased plaintiff, failed to use ordinary or due care for her own safety based on the conditions that existed on September 20, 1986, on Hilmar Drive and the power lines.

However, in deciding whether or not this girl was contributorily negligent in her actions on that date and at that time, she is not held to the same standard that you or I are held for the simple reason that she is a minor, and the standard that she is held to in regards to contributory negligence is that she is held to the same standard of care that a prudent child of her age, of her intelligence, of her experience and development would have used under the same or similar circumstances that existed that afternoon on September 20, 1986, and in order for you to answer question 2, yes, that is, she contributed to her own death, you have to be satisfied by a preponderance of the evidence, and that is, you have to go through the same gyrations as you did on question 1, and the scale has to tip in favor of the power company in order for you to answer this question, yes. If the scale comes out even or tips in her favor on the issue of contributory negligence, then you will answer the question, no.

*Electric Co-op. v. Blanchard,* 239 Md. 481, 485, 212 A.2d 301 (1965); *LeVonas v. Acme Paper Board Co.,* 184 Md. 16, 21, 40 A.2d 43 (1944); *Potomac Edison Co. v. State,* 168 Md. 156, 161, 177 A. 163 (1935); *Dageforde v. Potomac Edison Co.,* 35 Md.App. 37, 43, 369 A.2d 93 (1977). The question then for determination is whether the decedent here was aware of the dangerous condition and failed to use ordinary care to avoid injury. The burden of proof was on the appellant at trial to establish that the decedent failed to exercise ordinary care for her safety. *Potomac Edison Co., supra,* 168 Md. at 169, 177 A. 163. Appellant had to show that there was "some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." *Wright v. Hixon,* 42 Md.App. 448, 455, 400 A.2d 1138 (1979) (citing *Baltimore & O. R.R. v. Plews,* 262 Md. 442, 454, 278 A.2d 287 (1971)).

The evidence presented at trial disclosed that the decedent had never previously travelled along the pathway, that the power line had fallen to a location in close proximity to the pathway, and that, as thus positioned, it appeared to several witnesses that it was a "rope," or a "railing." In fact, the police investigators responding to the scene were unable to recognize the downed power line as such until further inspection traced it to the utility poles (about 500 feet apart) to which it was still attached. Decedent's companion, the only individual at the scene of the accident, testified that when the accident occurred, the decedent was walking two feet behind her, and to her right. Following a conversational pause, she looked back and observed the decedent on the ground with her left arm in contact with the fallen wire.

Thus, the evidence presented did not clearly establish that the dangerous condition (the fallen high voltage wire) was so obvious that a person of ordinary prudence could see it and appreciate its danger and thus avoid it. Therefore, under these circumstances, the court properly submitted the question of the decedent's contributory negligence to the

jury. *See Snider v. Senneville,* 267 Md. 552, 558, 298 A.2d 175 (1973); *Eastern Shore P.S. Co. v. Corbett,* 227 Md. 411, 423, 177 A.2d 701 (1962); *Potomac Edison Co., supra,* 168 Md. at 169, 177 A. 163; *Murphy v. Smith,* 53 Md.App. 640, 644, 455 A.2d 69, *cert. denied,* 296 Md. 61 (1983); *Robertson, supra,* 34 Md.App. at 408, 367 A.2d 962.

We shall not discuss the differences between "assumption of risk" and "contributory negligence" as suggested by appellant. In order to prevent a long opinion from being longer, it will suffice to say that as a matter of law there is no basis in this case for the application of the doctrine of assumption of risk to the decedent. *See* Gilbert, *Maryland Tort Law Handbook* § 11.6.

III. Was PEPCO's conduct characterized by malice?

■ The purpose of awarding punitive damages has been succinctly set forth by the late Judge Thomas Hunter Lowe in *Cheek v. J.B.G. Properties, Inc.,* 28 Md.App. 29, 34, 344 A.2d 180 (1975), in which he states:

> Exemplary or punitive damages, as the name connotes, are rather a punishment for and deterrent to wrongdoing than a means of recompensing the victim. To the victim they are a windfall not necessarily related to the injury he has suffered. "Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz v. Welch,* 418 U.S. [323] at 350 [94 S.Ct. 2997 at 3012], 41 L.Ed.2d [789] at 811 [1974].

PEPCO argues that before a jury can award punitive damages, it must find that the tortfeasor acted with either actual or implied malice. In this case, PEPCO contends, we must strike the award of punitive damages because even if its actions could be characterized as negligent, its conduct could not be characterized by either actual or implied malice. The appellees respond that the jury correctly found that PEPCO acted with implied malice and, therefore, the award of punitive damages must be affirmed. We agree with appellees and explain.

It is well established that punitive damages are recoverable in tort actions in this State, but an absolute prerequisite to their award is evidence that the tortfeasor's conduct was characterized by malice, either actual or implied. *Montgomery Ward & Co. v. Keulemans*, 275 Md. 441, 448, 340 A.2d 705 (1975); *American Laundry Mach. v. Horan*, 45 Md.App. 97, 111–13, 412 A.2d 407 (1980). Actual (or express) malice has been described as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff. *Siegman v. Equitable Trust Co.*, 267 Md. 309, 297 A.2d 758 (1972). On the other hand, implied malice may be legally inferred. In this regard, the Court of Appeals stated in *Conklin v. Schillinger*, 255 Md. 50, 71, 257 A.2d 187 (1969):

> The difficulty in the Maryland cases arises in regard to factual situations in which there is no evidence of *actual intent* to injure or of *actual malice* toward the injured person, but in which the defendant's conduct is of such an extraordinary character as possibly to be the legal equivalent of such actual intent or actual malice, sometimes described as 'wanton,' 'reckless disregard of the rights of others,' and the like ... (emphasis in original).

*Palmer Ford, Inc. v. Wood*, 65 Md.App. 390, 400–401, 500 A.2d 1055 (1985).

In order to find that a tortfeasor acted with implied malice, it is not necessary for the jury to find that the conduct was motivated by hatred or spite. In certain torts, conduct of an extraordinary or outrageous character may be considered the legal equivalent of actual malice, such as conduct which demonstrates that it was done with wanton or reckless disregard for human life. *See Miller Building Supply v. Rosen*, 305 Md. 341, 347–48, 503 A.2d 1344 (1986); *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 168, 297 A.2d 721 (1972); and *Exxon Corp. v. Yarema*, 69 Md.App. 124, 157, 516 A.2d 990 (1986).

In *Medina v. Meilhammer,* 62 Md.App. 239, 249–250, 489 A.2d 35, *cert. denied,* 303 Md. 683, 496 A.2d 683 (1985), the terms "willful," "wanton" and "reckless" in the context of finding implied malice were explained for the court by Judge John J. Bishop as follows:

> The usual meaning assigned to 'willful,' 'wanton,' or 'reckless,' . . . is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences. Since, however, it is almost never admitted, and can be proved only by the conduct and the circumstances, an objective standard must of necessity in practice be applied. The 'willful' requirement, therefore, breaks down and receives at best lip service, where it is clear from the facts that the defendant, whatever his state of mind, has proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position.
>
> The result is that 'willful,' 'wanton,' or 'reckless' conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. As a result there is often no clear distinction at all between such conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning, of an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care. It is at least clear, however, that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simple inattention.

Prosser and Keeton, *Law of Torts,* 834 pp. 212–214 (3rd ed. 1984) (footnotes omitted).

Both sides here agree that PEPCO did not act with actual malice. Hence, the only basis for an award of punitive

damages against the company would be on a finding that it acted with implied malice. The jury in this case in awarding punitive damages necessarily found that PEPCO's conduct was of such an extraordinary and gross nature as to constitute a wanton or reckless disregard of the rights of the decedent and others, and that the company therefore acted with the requisite implied malice. Our review of the jury's decision is limited to whether a rational mind could "infer from the evidence that appellant acted in such an extraordinary or outrageous manner so that their actions amounted to a wanton, reckless disregard for the appellee's (decedent here) rights?" *Medina, supra,* 62 Md.App. at 249, 489 A.2d 35.

In examining the evidence presented to the jury, we note that PEPCO's extraordinary conduct did not occur in a single event but persisted and continued over a period of time extending for twenty-four years. At any time during this period, PEPCO could have taken steps to correct the hazardous condition, but instead apparently chose to permit the existence of other conditions that intensified the hazard and increased the chance of injury to the community.

The jury heard evidence that PEPCO's original installation of the cross-arm in 1964 and its continued use after one side of it broke violated the National Electric Safety Code. Further, three separate citizens' complaints lodged within the month before the accident placed PEPCO on notice that its power line was down in an area where adults and children had been accustomed to traversing. Under these circumstances, we hold that its failure to repair the downed line was sufficient evidence to support the jury's finding of implied malice. *See* cases cited in our discussion of the "Duty of Care" *infra,* specifically, *Cornucopia, supra; Spence, supra;* and *Kulhanjian, supra.*[11]

---

11. Appellant urges that *Medina* and *Liscombe v. Potomac,* 303 Md. 619, 495 A.2d 838 (1985), requires reversal. This case is readily distinguishable from *Medina v. Mulhammer, supra. Medina* involved a single occurrence where workmen, having dug a hole which filled

## THE CAP

The Smiths assign as error the trial court's reduction in the award of damages by the jury from $500,000 to $350,-000 pursuant to section 11-108(b) of the Courts and Judicial Proceedings Article of the Maryland Code—Maryland's noneconomic damages cap.[12] Primarily, the Smiths contend that the cap, if applicable, violates several state and federal constitutional provisions. Before addressing the merits of this argument, however, we must resolve two preliminary contentions regarding the applicability of the cap to the present circumstances.

IV. Whether the cap on noneconomic damages, as provided in the Maryland Annotated Code, Courts and

---

with hot water, temporarily departed the area to obtain materials in order completely to secure the excavation. They saw no children in the area at the time of their departure, and had covered the hole as much as possible with plywood from a nearby window well. In the course of their temporary absence, a child fell into the hole and was injured. This court held that "while clearly negligent, [defendants' conduct] was not so extraordinary or outrageous as to raise that conduct to the qualitative level necessary to establish a foundation for punitive damages." *Id.* [62 Md.App.] at 251-252, 489 A.2d 35. Here, PEPCO engaged in an ongoing pattern of recklessness, from the installation of the defective cross-arm in 1964, to its negligent relocation of the power line on the other side of the cross-arm, to its total failure to take any corrective action in the face of three separate reports from residents of the neighborhood, spread over an entire month's period.

*Liscombe v. Potomac Edison Co.,* supra, is likewise readily distinguishable. There the electric company, after acquiring notice about a danger in its overhead wires, took prompt remedial measures to warn the workmen about the danger. No such notice was given to the community here.

**12.** Section 11-108(b) provides that:

In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

Md.Cts. & Jud.Proc.Code Ann., § 11-108(b) (1988 Supp.).

Judicial Proceedings Article, Section 11–108, applies to damages for wrongful death?

■ Appellees and the American Trial Lawyers Association ("ATLA") in its *amicus* brief argue that the damages recoverable under the Wrongful Death statute [13] are not limited by the cap because they are recoverable for the invasion of the property interests of the statutorily designated beneficiaries and not for personal injury. Until 1969, this contention may have been valid. Maryland's Wrongful Death statute was originally enacted in 1852, *see* Act of 1852, ch. 299, and was essentially derived from the English Lord Campbell's Act enacted in 1847. *See generally Stewart v. United Elec. Light & Power Co.*, 104 Md. 332, 65 A. 49 (1906). The statute created a new right of action, but it limited the damages recoverable to those affecting the beneficiaries' pecuniary interest. *Stewart, supra*, 104 Md. at 341, 65 A. 49. In 1969, the Maryland General Assembly amended the statute, broadening the types of damages recoverable for certain beneficiaries. *See* 1969 Md.Laws ch. 352. This amendment, codified at section 3–904(d) of the Courts and Judicial Proceedings article, provides:

> (d) *Damages if spouse or minor child dies.*—For the death of a spouse, minor child, or parent of a minor child, the damages awarded under subsection (c) are not limited or restricted by the "pecuniary loss" or "pecuniary benefit" rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable.

The Smiths fall into this category of beneficiaries as the decedent, their 15–year–old daughter, was a "minor child" at the time of her death. Further, it is apparent in this case

---

**13.** Maryland's Wrongful Death statute is codified at §§ 3–901 to 3–904 of the Courts and Judicial Proceedings article of the Maryland Code.

that most of their damages, if not all of them, were awarded based on the non-pecuniary criteria set forth above. These damages are those that are traditionally associated with personal injury actions.

The fact that such injuries are sustained by beneficiaries who have not sustained bodily injury is not decisive as to whether an action under the Wrongful Death statute is a personal injury action under the noneconomic damages cap.[14] In *Black's Law Dictionary*, "personal injury" is defined:

> In a narrow sense, a hurt or damage done to a man's *person*, such as a cut or bruise, a broken limb, or the like, as distinguished from an injury to his property or his reputation. The phrase is chiefly used in this connection with actions of tort for negligence and under worker's compensation statutes. But the term is also used (chiefly in statutes) in a much wider sense, and as including any injury which is an invasion of personal rights, and in this signification it may include such injuries to the person as libel or slander, criminal conversation, malicious prosecution, false imprisonment, and mental suffering.

*Id.* at 707 (5th ed. 1979). When the phrase has been examined in statutory provisions, courts have consistently interpreted it to encompass more than bodily injury. *See, e.g., Merimee v. Brumfield*, 397 N.E.2d 315 (Ind.App.1979) (In context of survival statutes, term "personal injury" includes "... any affront or detriment to the physical body,

---

**14.** Appellees attempt to make this distinction, relying on *Globe Amer. Cas. Co. v. Chung*, 76 Md.App. 524, 547 A.2d 654 (1988), *cert. granted,* 314 Md. 508, 551 A.2d 874 (1989). In that case, the wife of the decedent brought suit under the Wrongful Death statute to recover damages for her non-bodily injuries. Appellant's insurance policy limited recovery to "the insured or his legal representative" for "damages ... because of bodily injury." *See id.* at 541, 547 A.2d 654. We differentiated between a Wrongful Death action and a survival claim in holding that the express provisions of the insurance policy prevented the wife from recovering damages under the Wrongful Death statute out of the insurance proceeds. *Id.* at 541–42, 547 A.2d 654. *Chung* is limited by the express language of the insurance policy provisions in that case and is wholly inapposite here.

psyche, reputation or liberty"); *Gray v. Wallace*, 319 S.W. 2d 582 (Mo.1958) (same); *McCroskey v. Cass Cty.*, 303 N.W.2d 330 (N.D.1981) (term used within meaning of statute allowing recovery for "personal injury" against a political subdivision of the state "includes physical injuries, disease, sickness, mental anguish and suffering"); *Roberts v. State*, 57 Ohio App.2d 77, 385 N.E.2d 634 (1978) ("personal injury" used in context of two year statute of limitations for civil actions against the State includes action for loss of consortium).

The Smiths also contend that the noneconomic damages cap should be construed narrowly. They argue that the General Assembly's failure expressly to include such actions within the scope of the cap warrant their exclusion from the limitation.

Although the legislative intent in this regard is silent, our review indicates that the General Assembly intended that the cap be applied broadly. Originally, the legislation culminating with the enactment of the noneconomic damages cap was to apply only to "medical malpractice claims." *See* 1986 Md.Laws ch. 639. The scope of the cap was broadened to "tort claims" and, finally, to "any action for personal injury."[15] Further, in enacting the noneconomic damages cap in 1986, the General Assembly sought to alleviate what it perceived to be a severe liability insurance crisis in Maryland. The unpredictability and speculative nature of noneconomic damage awards has been cited as a basis for enacting a cap on such damages. *See Report of the Governor's Task Force To Study Liability Insurance*, pp. 10–11 (December, 1985). A United States Department of Justice Report before the General Assembly prior to the passage of

---

**15.** Because survivorship actions are not necessarily predicated upon tortious behavior, *see Chung, supra,* 76 Md.App. at 535, 547 A.2d 654, deletion of the term "tort claims" and replacing it with "any action for personal injury" is consistent with an intent by the General Assembly to broaden the application of the cap.

the current legislation documented the increase in awards in Wrongful Death cases. *See Report of the Tort Policy Working Group To The Domestic Policy Council on The Causes, Extent and Policy Implications of the Current Crisis In Insurance Availability and Affordability,* ch. 4, p. 17 & n. 28, chart L (February, 1986) (hereinafter *Report of the Tort Policy Working Group* ).

Noneconomic damages constitute the primary component of many awards under the Wrongful Death statute. The fact that the cap does not expressly enumerate the types of personal injury actions within its ambit is a function of its breadth, not a limitation of its application.[16] Application of the cap to wrongful death actions would effectuate the legislature's intent to alleviate the perceived liability insurance crisis by limiting noneconomic damages in a cause of action where such damages are usually the primary component. Therefore, we hold that the trial court did not err in holding that the cap applies to wrongful death actions.

---

**16.** Further, the several out-of-state cases relied upon by appellees and the Association of Trial Lawyers of America, in its amicus brief, in their contentions that the cap does not apply to wrongful death actions are readily distinguishable. The various New York cases are interpreting New York's Wrongful Death statute, wherein the non-pecuniary damages of the decedent's survivors are not expressly recoverable. *See* N.Y. Est. Powers & Trusts Law § 5–4.3 (McKinney 1979); *Bell v. Cox,* 54 A.D.2d 920, 388 N.Y.S.2d 118 (2nd Dept.1976). The term "personal injury" is statutorily defined in New York's General Constructions Law as "... other actionable injury to the person either of the plaintiff, or of another." N.Y.Gen.Constr.Law § 37–a (McKinney 1980). Thus, in New York, a wrongful death action where recovery is limited to pecuniary damages is not an action for personal injury. The remaining cases cited are similarly distinguishable.

In a case not cited by the parties, an intermediate appellate court in California recently held that California's $250,000 noneconomic damages cap applied to wrongful death actions. *See Yates v. Pollock,* 194 Cal.App.3d 195, 239 Cal.Rptr. 383 (2 Dist.1987). In responding to plaintiff's contention on appeal that the cap does not apply to wrongful death actions because its wording applied it only to "any action for injury against a health care provider," *see* Cal.Civ.Code § 3333.2(a) (Deering 1984), the court stated that "wrongful death claims are for 'injuries' suffered by the heirs of medical malpractice victims." 194 Cal.App.3d at 199, 239 Cal.Rptr. 383.

V. Whether the cap on noneconomic damages, as provided in the Maryland Annotated Code, Courts and Judicial Proceedings Article, Section 11–108, applies to each Plaintiff in a proceeding?

█ Although appellees acknowledge that only one cause of action may be brought for each death, *see* Md. Rule Q4la. (1989), they contend that the statute applies separately to each plaintiff. We need not decide whether appellees' contention is correct, because we hold that they have not preserved this issue for appeal.[17] By stipulation prior to trial, appellees agreed to a lump sum jury verdict, preferring to apportion the verdict between themselves later. On appeal, we have no way of determining the individual breakdown of the $500,000 jury award. We will not assume that neither of the plaintiffs' separate awards would exceed the cap.[18] Because the appellees agreed to accept a lump sum jury verdict without objection, they cannot complain that the trial court treated the damage award as one award in reducing the damages recoverable pursuant to § 11–108(b). To hold otherwise would require this court to make eviden-

---

**17.** In *Yates v. Pollock,* 194 Cal.App.3d 195, 239 Cal.Rptr. 383 (2 Dist.1987), an intermediate California appellate court did hold that California's $250,000 noneconomic damages limitation applied to all wrongful death plaintiffs in the aggregate, not individually. The court noted that only one action can be brought for the wrongful death damages and the cap limits damages "in any single medical malpractice action [to] $250,000." 194 Cal.App.3d at 200, 239 Cal.Rptr. 383 (original emphasis). In *Hallett v. Town of Wrentham,* 398 Mass. 550, 499 N.E.2d 1189 (1986), the Supreme Judicial Court of Massachusetts held that a $100,000 limitation on recovery of damages from a governmental entity "applies to the total recovery by the executor or administrator in the wrongful death action, and not separately to each beneficiary's damages." *Id.,* 499 N.E.2d at 1193. Although the Maryland wrongful death statute also requires all beneficiaries to bring their claims in a single action and § 11–108(b) also limits the recovery of noneconomic damages "[i]n any action," we need not decide the merits of appellee's contention because of their waiver of the issue by their actions in the trial court.

**18.** The decedent lived with her mother who was not married to decedent's father. Decedent's father lived elsewhere. It would not be unreasonable to assume that most of the damage award was for the injuries to decedent's mother under the statute.

tiary assumptions unsupported by any facts that all plaintiffs in a wrongful death action have sustained damages that are monetarily the same. This we refuse to do. In light of appellees' acquiescence to the jury's determination of damages, we perceive no error.

VI. Whether the imposition of a cap on noneconomic damages is constitutional?

A. *Jury Trial*

■ Preliminarily, both appellant and the State in its *amicus* brief argue that the constitutional right to trial by jury does not attach to proceedings under the Wrongful Death statute. They contend that constitutional rights do not attach to civil statutory causes of action created after the adoption of the state constitutional provision preserving the right to trial by jury.[19] Assuming *arguendo*, however, that a constitutional right to a jury trial under Article 23 of Maryland's Declaration of Rights vests in certain statutorily-created causes of action enacted after Article 23 was adopted, *cf. Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (holding that Seventh Amendment right to a jury trial vests in certain statutory causes of action where "the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law"), we hold that the cap, as applied under these circumstances, does not violate appellees' right to trial by jury.

---

**19.** Maryland's right to a jury trial provision was originally adopted in 1851. As we stated earlier, Maryland originally adopted the Lord Campbell's Act in 1852. Since that time, the statute has undergone very little substantive change with the exception of the amendment in 1969 that allows certain beneficiaries to recover noneconomic damages.

The Court of Appeals recently held that Article 19 of the Declaration of Rights does not prevent statutory abrogation of the judicially-created discovery rule where the rule was adopted 50 years after Article 19 was ratified, and the statute actually provided a longer limitation period than that in existence at the time Article 19 was adopted. *See Hill v. Fitzgerald*, 304 Md. 689, 704–05, 501 A.2d 27 (1985).

In pertinent part, Article 23 of Maryland's Declaration of Rights provides:

The right of trial by jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of five hundred dollars, shall be inviolably preserved.[20]

Appellees contend that the noneconomic damages cap invades the fact-finding province of the jury by restricting its ability to determine and fully assess damages. Appellants counter that the cap was enacted pursuant to the valid legislative policy-making powers of the General Assembly.

We begin our constitutional analysis by reiterating the established principle "that a person may only assert his own constitutional rights or immunities." *Clark v. State*, 284 Md. 260, 264, 396 A.2d 243, *cert. denied*, 444 U.S. 858, 100 S.Ct. 119, 62 L.Ed.2d 77 (1979); *see also McGowan v. Maryland*, 366 U.S. 420, 429, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393 (1961); *Turner v. State*, 299 Md. 565, 571, 474 A.2d 1297 (1984). Thus,

one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.

*Clark, supra*, 284 Md. at 264, 396 A.2d 243 (quoting *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960)). *Cf. Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (gender-neutral statute criminalizing sodomy is not unconstitutional in application to consensual homosexual activity because there is no fun-

---

**20.** On amicus brief, the Association of Trial Lawyers of America and the Maryland Trial Lawyers Association argue that the cap violates the right to a jury trial under the Seventh Amendment of the United States Constitution. As of yet, the Seventh Amendment *per se* has not been applied to proceedings in state courts. *See Attorney General v. Johnson*, 282 Md. 274, 309 n. 34, 385 A.2d 57 (1978); *Bringe v. Collins*, 274 Md. 338, 344–45, 335 A.2d 670 (1975). Thus, we need only examine the statute's constitutional muster under the analogous state constitutional provision.

damental right under the United States Constitution to engage in consensual, homosexual sodomy). Thus, our review is confined to the determination of whether § 11–108(b) is unconstitutional as applied to wrongful death claimants.

As we have already stated, the General Assembly, by enacting Maryland's wrongful death statute in 1852, created a cause of action where there previously had been none under the common law. *See Stewart, supra,* 104 Md. at 341, 65 A. 49. Not until 1969 did the General Assembly amend the statute to include damages for nonpecuniary injury.

We are confident that had the General Assembly chosen to do so, it could have constitutionally enacted a noneconomic damage limitation within the 1969 amendment permitting the recovery of nonpecuniary damages, as it would have been within its power to so modify a cause of action that was a creature of legislation in the first place. *See Richards v. United States,* 285 F.2d 521 (10th Cir.1960); *Goldstein v. Hertz Corp.,* 16 Ill.App.3d 89, 305 N.E.2d 617 (1st Dist.1973); *Keeley v. Great Northern Ry. Co.,* 121 N.W. 167 (Wis.1909); *Baltimore & O.R. Co. v. Taylor,* 186 F. 828 (4th Cir.1911); *Owen v. Meserve,* 381 Mass. 273, 408 N.E.2d 867 (1980); *Glick v. Ballentine Produce, Inc.,* 396 S.W.2d 609 (Mo.1965). *Cf. Mulhern v. Talk of the Town,* 138 Ill.App.3d 829, 93 Ill.Dec. 282, 486 N.E.2d 383 (2 Dist.1985) (limitation on damages in statutorily created Dramshop Act is constitutional). In a recent federal court opinion upholding the constitutionality of Maryland's cap, Judge Paul Niemeyer of the District Court for Maryland iterated:

> "If the legislature can act within its proper sphere of authority and completely eliminate a cause of action for negligence or repeal whole categories of recoverable damages under recognized torts, then it must follow that the legislature has the power to define causes of action and limit categories of recoverable damages for reasonable policy considerations without offending the Seventh Amendment."

*Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325, 1333 (D.Md.1989). As cogently put in *Glick, supra,* "[t]he legislature *created* the right of action where none existed before, and it may condition the right as it sees fit." *Id.* at 615. The only difference here is that a generally applicable cap on noneconomic damages is being applied, in this case, years after the enactment of the statute that created the cause of action.

Under the facts of the case before us, § 11–108(b) is not unconstitutional as applied to the appellees. The General Assembly would be well within its authority to abolish wrongful death actions if it chose to do so. Certainly, it would be well within its authority to repeal the 1969 statute permitting recovery for noneconomic loss in wrongful death actions. Within its powers to create a cause of action or abolish a statutory cause of action is the power to modify such statutory actions. Limitation of the jury's determination of damages in a statutorily-created cause of action is a proper modification of the remedy available in such actions and does not violate Article 23 of Maryland's Declaration of Rights. We need not determine whether complete abrogation of the right to trial by jury in such actions would infringe on one's constitutional right to trial by jury; nor do we decide whether § 11–108(b) is unconstitutional when applied to common law actions for personal injuries.

### B. *Article 19 and Due Process*

■■■ Appellees and ATLA contend that section 11–108(b) violates Article 19 of Maryland's Declaration of Rights. That provision requires:

That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land.

They argue that a personal injury plaintiff is denied access to the court and a full remedy because no alternative remedy or *quid pro quo* is provided. Appellant and the

State counter that § 11–108(b) does not limit access to a court in a way that is arbitrary or unreasonable. They contend that the legislative goal—lending stability to the civil justice system—is furthered by means "reasonably related to that purpose."

It has been stated that Article 19 provides "the same due process of law required by the fourteenth amendment." *See Hill v. Fitzgerald,* 304 Md. 689, 702, 501 A.2d 27 (1985); *Whiting–Turner Contracting Co. v. Coupard,* 304 Md. 340, 360, 499 A.2d 178 (1985); *Attorney General v. Johnson,* 282 Md. 274, 298, 385 A.2d 57 (1978). Due to the unique facts and circumstances of this case, we need not decide whether a *quid pro quo* is required for § 11–108(b) to satisfy due process requirements.

In *Hill v. Fitzgerald, supra,* the constitutionality of § 5–109 of the Courts and Judicial Proceedings article was questioned. That statute, enacted in 1975, required medical malpractice patients to file suit within five years from the date the injury was sustained or within three years from the date when the injury was discovered, whichever was earlier. Hill argued that the statute impermissibly denied him access to the court by infringing upon the common law discovery rule adopted by the Maryland courts in 1917. The case was brought in the United States District Court for the District of Maryland, and several questions, including the constitutionality of § 5–109, were certified to the Court of Appeals.

The court of appeals held that § 5–109 did not "make distinctions based on a suspect classification or significantly interfere with a fundamental right." *Id.* [304 Md.] at 703, 501 A.2d 27. Finding § 5–109 to be "reasonable," the court upheld its constitutionality. As an alternative ground, the court stated:

> At the time of the 1867 Constitutional Convention at which Art. 19 was proposed, Maryland Code (1860, 1861–67 Supp.) Art. 57, § 1 was then in effect and provided in virtually all tort and contract actions that suit must be commenced within three years "from the time, the cause

of action accrued." Maryland law then provided that limitations against a right or cause of action, including a malpractice action, ran from the date of the alleged wrong and not from the time the wrong was discovered. It was not until 1917, in *Hahn v. Claybrook*, [130 Md. 179, 100 A. 83 (1917)] ... that the discovery rule was first made applicable by judicial decision in medical malpractice cases. As the limitation period provided in § 5-109 is actually longer than that provided by the law existing at the time that Art. 19 was adopted, no violation of that constitutional provision is here involved.

*Id.* at 704-05, 501 A.2d 27.

Likewise, at the time Article 19 was adopted, the Wrongful Death statute only permitted beneficiaries to recover pecuniary damages. Non-pecuniary injury was made compensable for certain beneficiaries for the first time in 1969. Section 11-108(b) limits the recovery of those non-pecuniary damages to $350,000. Even with this limitation, wrongful death beneficiaries are entitled to a greater remedy than was provided by the Wrongful Death statute at the time Article 19 was adopted. Thus, under the same analysis in *Hill, supra,* § 11-108(b), as applied to wrongful death beneficiaries, does not violate Article 19 of the Maryland Declaration of Rights.

## C. *Equal Protection*

Appellees and ATLA contend that § 11-108(b) also violates equal protection principles embodied within Article 24 of Maryland's Declaration of Rights [21] and the Fourteenth Amendment of the United States Constitution. Traditionally, an equal protection analysis entailed a two-tiered approach. If the legislation infringed a fundamental right or involved a suspect classification, strict scrutiny was applied.

---

**21.** Although Maryland's Declaration of Rights contains no express equal protection mandate, such principles have been found to be implicit within the due process considerations of Article 24. *Attorney General v. Waldron,* 289 Md. 683, 704, 426 A.2d 929 (1981).

The legislation would only survive where it was necessary to further a compelling governmental interest. If the legislation did not involve a suspect classification or a fundamental right, then a "rational basis" test was utilized. Under that test, the law would survive an equal protection analysis unless it was "wholly irrelevant to the achievement of the State's objective." *Attorney General v. Waldron,* 289 Md. 683, 707, 426 A.2d 929 (1981) (*quoting McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

Recently, both the U.S. Supreme Court and the Court of Appeals of Maryland have haltingly gravitated towards adoption of a third tier to the equal protection analysis. This tier evolved from the rational basis analysis and has been referred to as "rationality that is not toothless." *Mathews v. Lucas,* 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). First adopted by the Court of Appeals in *Waldron, supra,* this "heightened scrutiny" test was most clearly articulated in *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983):

"Heightened scrutiny" of a legislative classification is ... applied when a statute impacts upon "sensitive," although not necessarily suspect criteria of classification (*i.e.,* gender discrimination), or where a statute affects "important" personal rights or works a "significant" interference with liberty or a denial of a benefit vital to the individual. *Waldron, supra,* 289 Md. at 711 [426 A.2d 929]. A legislative classification, to withstand heightened scrutiny analysis, must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly situated and circumstanced will be treated alike. This level of review does not tolerate random speculation concerning possible justification for a challenged enactment; rather, it pursues the actual purpose of a statute and seriously examines the means

. chosen to effectuate that purpose. *Id.* at 713–14 [426 A.2d 929].

*Id.* at 641–42, 458 A.2d 758.

■ Conceding that the right to receive an award in full of noneconomic damages is not a fundamental one and that personal injury victims whose noneconomic damages exceed the cap are not a suspect class, appellees and ATLA argue that it is an "important personal right" and that "heightened review" of the statute is the proper equal protection test. Appellant and the State counter that the rational basis test should be applied.

■ We think that under the federal constitution, at least, the rational basis test is the appropriate test. Such an analysis is indirectly supported by the Supreme Court's utilization of the rational basis test in upholding a federal law limiting to $560 million the damages recoverable from a nuclear power plant operation in the event of an accident in *Duke Power Co., supra.* Further, this view is obliquely supported by the Supreme Court's dismissal of an appeal for want of a substantial federal question in *Fein v. Permanente Medical Group,* 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 215, *dismissing an appeal from* 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d .665 (1985). The Supreme Court's application of the rational basis test to a Texas statute that purportedly infringed upon one's right to education in *San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), evidences a disinclination by the Court to apply a higher standard to the rights infringed by damage limitations. Nearly every federal court examining the various state caps has applied the rational basis test in holding that the caps do not violate the 14th Amendment of the United States Constitution. *See, e.g., Lucas v. United States,* 807 F.2d 414 (5th Cir.1986); *Hoffman v. United States,* 767 F.2d 1431 (9th Cir.1985); *Boyd v. Bulala,* 647 F.Supp. 781 (W.D.Va.1986). *See generally* Comment, *Blasting the Cap: Constitutional Issues Arising From Maryland's Limitation of Noneconomic Damages In Per-*

*sonal Injury Claims,* 16 U.Balt.L.Rev. 327, 337–38 (1987). *But see Waggoner v. Gibson,* 647 F.Supp. 1102 (N.D.Tex. 1986) (Texas cap failed to satisfy rational basis test). We think that the General Assembly possessed a rational basis to believe that a liability insurance crisis existed and that enactment of the cap was not arbitrary or unreasonable to alleviate the financial crisis it may have perceived.[22] Thus, the cap does not violate the 14th Amendment of the United States Constitution.

Upholding the statute's federal constitutionality does not necessarily resolve the equal protection issue under the state constitution. In *Waldron,* the Court of Appeals stated:

> Although the equal protection clause of the fourteenth amendment and the equal protection principle embodied in Article 24 are "in pari materia," and decisions applying one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent, and a violation of one is not necessarily a violation of the other.

*Id.* [289 Md.] at 714, 426 A.2d 929. Significantly, albeit subtlely, the court in *Hornbeck, supra,* implicitly recognized that significant interference with the "right to take advantage of a thorough and efficient education" would merit heightened review. *See id.* [295 Md.] at 653, 458 A.2d 758. The rational basis test was applied in *Hornbeck,* not on the precedent established by *Rodriguez, supra,* under the federal Constitution, but because the court found that the statute did not significantly interfere with the right to

---

**22.** Not all courts have found that the purpose of the enactment of such statutes is valid. In *Arneson v. Olson,* 270 N.W.2d 125 (N.D. 1978), the court examined a $300,000 limitation on damages recoverable in medical malpractice actions, which was enacted during the first wave of tort reform legislation in the mid–1970's:

> Based upon these facts, and others of the same import, the trial court made a finding that there did not appear to be an availability or cost crisis in this State. We cannot say that this finding is clearly erroneous, based upon the evidence in this case.

*Id.* at 136.

education. Thus, *Hornbeck* provides a basis to believe that in appropriate circumstances the Court of Appeals might apply more rigorous scrutiny to a statute under an equal protection challenge than would the U.S. Supreme Court.

The right to recover in full for one's personal injuries has been examined by several state courts in the context of state statutes limiting recovery of damages. Several courts, relying on federal precedent, have applied the rational basis test and upheld the statute's constitutionality. *See Fein v. Permanente Medical Group,* 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985); *Johnson v. St. Vincent Hosp.,* 273 Ind. 374, 404 N.E.2d 585 (1980); *Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657 (1977). Other states have applied intermediate scrutiny and struck down their respective caps. *See Jones v. State Bd. of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977) (adopting intermediate standard and reversing and remanding to trial court for its determination based on that standard; trial court held cap unconstitutional on remand); *Arneson v. Olson,* 270 N.W. 2d 125 (N.D.1978) (test applied was "whether there is a sufficiently close correspondence between statutory classification and legislative goals"); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980) (applied "more rigorous judicial scrutiny than allowed under the rational basis test").

In Maryland, the only case to apply a standard of "heightened review" has been *Waldron, supra.* In *Waldron,* the statute in question prevented certain retired judges from practicing law for compensation. In holding that one's "right to engage in a chosen calling, once all reasonable requirements established by the legislature for the protection of the health, safety and welfare of the citizens have been complied with," is an important personal right, the court struck down the statute as a violation of equal protection. *See id.* [289 Md.] at 718, 727–29 [426 A.2d 929].

As applied here, § 11–108(b) limits the recovery of noneconomic damages to $350,000 to statutory wrongful

death beneficiaries. The right to recover such damages, having been legislatively created just 20 years ago, is not an "important personal right" within the contemplation of *Waldron, supra*. We think that the rational basis test is the test to be applied in examining such a limitation as applied to wrongful death actions. Neither appellees, nor ATLA, proffer any persuasive argument that the statute, as applied, is unreasonable or arbitrary. As applied, § 11–108(b) does not violate the equal protection principles embodied within Article 24 of the Maryland Declaration of Rights.

VII. Did the award of punitive damages violate the Constitution of the United States?

▉▉▉ PEPCO attacks the constitutionality of punitive damages on several grounds.[23] PEPCO contends, first, that the standards used in Maryland to govern an award of punitive damages are void for vagueness and thus violate the 14th Amendment to the United States Constitution. Second, the company alleges that an award of punitive damages in the amount of seven million five hundred thousand dollars violates the 8th Amendment of the United States Constitution prohibition against excessive fines, and finally PEPCO argues that because punitive damages are quasi-criminal in nature, the Company should have been afforded a higher degree of proof.

As the appellees correctly point out, thus far attacks on the constitutionality of punitive damages have been rejected

---

**23.** Appellees contend that, pursuant to Md.Rule 8–131, we should not decide this issue because appellant failed to make these claims "in the trial court before the jury retired." Our review of the record, however, indicates that appellant raised the issue of the constitutionality of punitive damages in its pleadings and its argument to the judge at the hearing on its motion for new trial. Appellant also took exception to the judge's instruction to the jury regarding punitive damages. Appellant told the court, before the jury retired, that it should not have given a punitive damage instruction. The court explained to the appellant at the motion for new trial that the law, as he understood it, permits punitive damages. Therefore, the issue, having been raised and decided below, has been preserved for appellate review.

consistently by the courts. The Supreme Court, as early as 1851 in the case of *Day v. Woodworth*, 13 How. 363, 371, 14 L.Ed. 181 (1851), expressly recognized the power of a jury in certain tort actions to assess against the tortfeasor punitive or exemplary damages. Later, in 1859, the Supreme Court in *Philadelphia, Wilmington & Baltimore Railroad Co. v. Quigley*, 62 U.S. (21 How.) 202, 16 L.Ed. 73 (1859) set forth the standard under which a jury is entitled to award punitive damages against a defendant. The court specifically stated,

> Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury is not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations.

*Id.* at 213–14. As recently as 1967, the Supreme Court in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 159, 87 S.Ct. 1975, 1994, 18 L.Ed.2d 1094 (1967), stated that "the Constitution presents no general bar to the assessment of punitive damages in a civil case."[24] *See also* Ghiardi & Kircher, *Punitive Damages, Law and Practice*, § 3.03 (1985 & Cum.Supp.1988).

Federal courts have similarly rejected arguments that a large award of punitive damages violates the 8th Amendment of the United States Constitution prohibition against excessive fines. *See e.g., Electro Services, Inc. v. Exide Corp.*, 847 F.2d 1524, 1530–31 (11th Cir.1988); *Kelco Dis-*

---

**24.** We note that the Supreme Court has granted certiorari recently in *Browning–Ferris Indus./v. Kelco Disposal, Inc.*, ─── U.S. ───, 109 S.Ct. 527, 102 L.Ed.2d 559 (1988), to answer the question of "whether an award of six million dollars in punitive damages amounting to more than one hundred times the plaintiff's actual damages from a purely economic tort is excessive under the Eighth Amendment or otherwise."

*posal v. Browning–Ferris Indus.*, 845 F.2d 404, 410 (2d Cir.), *cert. granted,* —— U.S. ——, 109 S.Ct. 527, 102 L.Ed.2d 559 (1988). Likewise, claims that, because punitive damage awards are essentially criminal in nature, they mandate the procedural protections afforded by the 8th and 14th Amendments to the United States Constitution have been rejected. *See Miller v. Cudahy Co.,* 858 F.2d 1449, 1459 (10th Cir.1988).

With respect to appellant's argument that the standards for awarding punitive damages are vague, Maryland common law has repeatedly permitted juries to award punitive damages in civil cases, provided they apply the standards set forth by the Supreme Court, *i.e.,* they find that the defendant conducted himself in an extraordinary manner, characterized by wanton or reckless disregard for the rights of others.[25] *See, e.g., Dennis v. Baltimore Transit Co.,* 189 Md. 610, 56 A.2d 813 (1948); *Baltimore & O. R.R. Co. v. Breinig,* 25 Md. 368 (1866); *Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990 (1986); and *Medina v. Meilham-*

---

**25.** The trial court's instructions to the jury expressly stated the following with regard to the standard necessary to award punitive damages:
> We have an allegation in this case that the estate is seeking what we call punitive damages, and in that regard I instruct you as a matter of law that we allow juries, based on the facts and circumstances of each case, we allow them the discretion, if they want to, to award an additional amount of damages that we call punitive damages, for two reasons. They are done to punish a defendant and to deter other people from acting in a similar manner. But in order for you to find or exercise your discretionary act, you have to find that, number one, the power company in this case either acted maliciously in some way, or intended to injure this girl in some way, and in regard to those two terms, I instruct you as a matter of law, that under our law, we consider that malice or the malicious act exists if in the light of the risk and the dangers which were known to the defendant, or should have been known to the defendant, at the time that the conduct or their conduct complained of, was performed in such a way and under such circumstances that their *actions were so reckless and so outrageous as to indicate, number one, a disregard for the safety of other people,* or secondly, to show a *wanton disregard for human life.* The acts complained of had to be so blatantly outrageous that it would necessarily warrant your awarding punitive damages in this case.

(Emphasis supplied).

*mer,* 62 Md.App. 239, 489 A.2d 35, *cert. denied,* 303 Md. 683, 496 A.2d 683 (1985). *See also* Gilbert, *Maryland Tort Law Handbook* § 25.3.1.

What the Supreme Court has declared constitutional we may not put asunder, consequently, we hold in the case *sub judice* the award of punitive damages did not violate any aspect of the Constitution.

VIII. Were there compensatory damages in the survival action upon which to base an award of punitive damages?

Appellant contends that the jury's award of punitive damages under the survivorship claim was improper due to the absence of a predicate compensatory damage award.[26] Appellees argue that the jury did award compensatory damages under this count. In the alternative, they contend that under the present circumstances, an award of compensatory damages was not required.

In Maryland, a well-settled prerequisite for punitive damages is an award of compensatory damages. *Nast v. Lockett,* 312 Md. 343, 349, 539 A.2d 1113 (1988); *Rite Aid Corp. v. Lake Shore Inv.,* 298 Md. 611, 626, 471 A.2d 735 (1984); *Montgomery Ward & Co., Inc. v. Keulemans,* 275 Md. 441, 446, 340 A.2d 705 (1975); *Shell Oil Co. v. Parker,* 265 Md. 631, 644, 291 A.2d 64 (1972). Appellees assert that the $2,000 in funeral expenses that the jury awarded under § 7–401(x)(2) satisfies this requirement.[27]

 Section 7–401(x) of the Estates and Trust article of the Code provides that a personal representative may bring "any personal action which the decedent might have

---

**26.** The defendant's liability for punitive damages has already been established.

**27.** Although the jurors awarded $500,000 compensatory damages to the appellees for their wrongful death claim, the predicate compensatory damage award must be for the same claim as the punitive damage award. *Keulemans, supra,* 275 Md. at 446–47, 340 A.2d 705; *Rispoli v. Jackson,* 51 Md.App. 606, 613, 445 A.2d 349 (1982).

commenced or prosecuted." Subsection (x)(2) allows the personal representative to recover up to $2,000 in funeral expenses. The personal representative of a decedent's estate may recover punitive damages where the decedent, had she survived, could have recovered them.[28] *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 160, 297 A.2d 721 (1972). Focusing on this language, appellant states that if decedent had lived, she would not have been able to recover funeral expenses; thus, where the sole "compensatory" damages recovered under the survivorship statute are funeral expenses, punitive damages may not be recovered. We disagree with appellant's position.

Although a person who sustains personal injuries and survives would not sustain funeral expenses, he would without doubt sustain compensable injuries where the defendant's negligence is established. Thus, funeral expenses could be considered "substitute damages" for the pain and suffering the decedent would have suffered or for medical expenses she would have sustained had she not expired. Such a view would be consistent with the view stated in *Gray Concrete Pipe Co., supra,* that "if a wrongdoer may be punished if his victim lives, then surely he should not escape retribution if his wrongful act causes a death." *Id.* at 160, 297 A.2d 721 (*quoting Leahy v. Morgan,* 275 F.Supp. 424, 425 (N.D.Iowa 1967)). Thus, we hold that where liability is established, an award of funeral expenses satisfies the compensatory damage predicate for a punitive damage award.

 Even if the funeral expenses did not constitute compensatory damages, we would hold that the jury properly awarded punitive damages. The general rule requiring an award of compensatory damages before punitive damages may be awarded is not without exception. In *Keulemans, supra,* $1,350 in compensatory damages was awarded on a false arrest count and $25,000 was awarded in

---

**28.** Punitive damages are not recoverable in wrongful death actions. *Cohen v. Rubin,* 55 Md.App. 83, 101–02, 460 A.2d 1046 (1983).

punitive damages on a malicious prosecution count. No compensatory damages were awarded on the malicious prosecution count. The court noted that $350 in attorney's fees for defending the shoplifting case was lumped with the compensatory damages in the false arrest count.

In refusing to reverse the award of punitive damages, the court noted that such attorney's fees should have been recoverable in the malicious prosecution case. Thus, the court remanded to the lower court to correct this defect in the jury verdict.

In *Exxon Corp., supra,* a compensatory damages award was reduced to zero to reflect amounts received previously by the plaintiff in accordance with a settlement agreement with defendants who settled before trial. On appeal, the non-settling defendant argued that punitive damages were improperly assessed against it because there was no compensatory damages awarded. The court held:

> The jury awarded compensatory and punitive damages to both of these plaintiffs. At this point in time, the Yaremas and S & S had satisfied "the general rule that punitive damages cannot be recovered *without proof of actual loss." Shell Oil Company v. Parker,* 265 Md. 631, 640, 291 A.2d 64 (1972) (emphasis added). Only if plaintiffs had failed to prove compensatory damages in their suits would they be precluded from recovering punitive damages. The trial court's subsequent reduction of their compenatory awards to zero was not a determination that the compensatory damages awards were not appropriate, but that the Yaremas and S & S were statutorily precluded from collecting them because of their previous settlements. Since the jury found actual damages for the Yaremas and S & S, the awards of punitive damages were proper.

*Id.* [69 Md.App.] at 139, 516 A.2d 990. The term "proof of actual loss" has apparently been equated with an award of compensatory damages, not only in *Exxon Corp.* but also in *Shell Oil Co., supra,* 265 Md. at 640, 291 A.2d 64 and *Schloss v. Silverman,* 172 Md. 632, 642, 192 A. 343 (1937).

In *Nast, supra,* the court stated "there must be at least a showing of compensable injury, that is, an award of compensatory damages, before a recovery of punitive damages is allowed." *Id.* [312 Md.] at 349, 539 A.2d 1113.

Under the unique circumstances before us, there has been proof of an "actual loss" or a "showing of compensable injuries" although, aside from the award for funeral expenses, no compensatory damages were awarded in the survivorship action. In arguing that no punitive damages may be awarded, appellant shall not be permitted to rely on the fact that its reckless act instantaneously caused the death of the 15–year–old decedent. Because punitive damages are not recoverable under the wrongful death statute, *see Cohen v. Rubin,* 55 Md.App. 83, 101–02, 460 A.2d 1046 (1983), in cases of instantaneous death punitive damages would be precluded under appellant's theory. Such a result would thwart the policy of punitive damages "to punish the wrongdoer for misconduct and to deter future egregious conduct by others." *Exxon Corp. v. Yarema,* 69 Md.App. 124, 137, 516 A.2d 990 (1986), *cert. denied,* 309 Md. 47, 522 A.2d 392 (1987). To establish a policy rewarding defendants otherwise liable for punitive damages for their expediency in causing an innocent person's death would be absurd. We refuse to do so, and we uphold the jury's award of punitive damages in the survivorship claim.

IX. Is it a violation of public policy to award punitive damages against a public utility?

PEPCO argues that its status as a public utility protects it against an assessment of punitive damages. The basis of PEPCO's claim is that because it functions like a branch of a municipal authority by providing services to the public, and it is highly regulated by government agencies, it should be immune from an award of punitive damages. Although this is a creative argument, it completely lacks any merit.

PEPCO is not a branch of a municipal authority, nor does it operate as such. It is a privately owned, foreign corpora-

tion. It has its own board of directors and stockholders, and exists for the pecuniary profit of its stockholders. Its stock is actively traded on the New York Stock Exchange. *See State v. Canova*, 278 Md. 483, 496, 365 A.2d 988 (1976) (sanitary commission was not a municipality, municipal corporation, or political subdivision because it lacks the power of local self-government). Consequently, PEPCO should be treated as any other private company that is subject to awards of punitive damages.

This view is consistent with the common law nationwide. Courts around the country have held that a power company is not immune from punitive damages when it is found guilty of gross negligence or willful or wanton misconduct.[29] For example, in *Cole v. Duke Power Co.*, 81 N.C. App. 213, 344 S.E.2d 130 (1986), the Court of Appeals of North Carolina held that decedent's estate could recover $1.5 million in punitive damages against the power company because in leaving an unlocked, unlabelled cabinet containing uninsulated wires transmitting over 12,000 volts of electricity, it was guilty of gross negligence. *See also Otey v. Florida Power & Light Co.*, 400 So.2d 1289, 1291 (Fla. App.1981) (jury could award punitive damages if they found that the power company committed willful or wanton disregard of the rights of others in maintaining an unprotected wire over a parking lot located near a boat ramp); *Kohler v. Kansas Power & Light Co.*, 192 Kan. 226, 387 P.2d 149, 151 (1963) (court upheld award for punitive damages against the public utility); *Gilbert v. Duke Power Co.*, 255 S.C. 495, 179 S.E.2d 720 (1971) (plaintiff would be entitled to punitive damages against power company when he proves wanton, willful or malicious violation of his rights); *Southwestern Gas & Electric Co. v. Stanley*, 123 Tex. 157, 70 S.W.2d 413 (1934) (court upheld award of exemplary damages against

---

**29.** In 29 C.J.S. *Electricity* § 73 (1983), it states:

An electric light or power company is liable for punitive damages in case of wanton disregard of the safety of the public, but punitive damages are not recoverable where no willful or malicious conduct is alleged.

the utility company); *Texas Cities Gas Co. v. Weller*, 75 S.W.2d 159 (Tex.Civ.App.1934). Likewise, PEPCO, as a privately owned corporation, albeit heavily regulated, is liable for all damages, including punitive damages.

X. May a Plaintiff be awarded more relief than she asks for in her Complaint?

 Appellant contends that the trial court erred when it refused to grant a remittitur of punitive damages. In its motion for a new trial, appellant argued that the jury verdict was excessive in that it bore "no relationship to reality" and was a result of the jury's emotions. It contends on appeal that the amount awarded ($7.5 million) exceeded the amount requested in the *ad damnum* clause of appellees' amended complaint. Because appellant did not present this argument in its motion for a new trial below,[30] we hold that it has waived the issue for the purpose of our review. *See* Md.Rule 8–131(a).

Appellant is correct in its contention that remittitur is the appropriate remedy for a jury award that exceeds the damages claimed in the complaint. *See Finch v. Mishler*, 100 Md. 458, 59 A. 1009 (1905); *Attrill v. Patterson*, 58 Md. 226 (1882); *Carl M. Freeman Assoc. v. Murray*, 18 Md. App. 419, 306 A.2d 548 (1973). To preserve an excessive damages argument on appeal, a party must move for a new

---

**30.** At a hearing on its motion for a new trial, appellant's entire argument as to the excessiveness of punitive damages was as follows:
Finally, Your Honor, I would suggest in this particular case that we are entitled to a new trial on the sheer basis, or the simple basis that the verdict in this case is excessive, that the damages in this case bear no relationship to reality, that, in fact, the excessive amount, if anything, shows in fact the passion that the jury had in this particular case and that I believe rather than—I believe we should have a remittitur also, but I also believe that Your Honor should order not only, not only a remittitur in this particular case, you also should order a new trial because of the excess of the verdict. I know Your Honor has been aware as both a judge and in private practice of cases where this was done. Your Honor has much more experience than I have and I don't feel I need to bring this issue up further.
(Joint Record Extract 576–77).

trial below. *Battista v. Savings Bank of Baltimore,* 67 Md.App. 257, 273, 507 A.2d 203 (1986). Appellant did move for a new trial, but nowhere below did it assert as a basis for its motion that the award of punitive damages exceeded that requested in the *ad damnum* clause of the amended complaint. In *Carl M. Freeman Assoc. v. Murray,* 18 Md.App. 419, 306 A.2d 548, *cert. denied,* 269 Md. 756 (1973), this court noted that although the declaration sought $10,-000 in compensatory damages, the jury awarded $15,000 in such damages. The court stated in *dicta:*

> The appellants, however, did not raise the issue of the excess of the judgment over the *ad damnum* in the court below. Nor did they press the point in their brief and oral argument in this Court. Accordingly, we are precluded from considering the question by virtue of both Rule 1085 and Rule 1031 c 2.

*Id.* at 420 n. 3, 306 A.2d 548. Although in this case appellant squarely addresses the issue on appeal, its failure to articulate this point to the trial court below precluded the court from correcting any alleged error. Thus, the argument is waived. Md.Rule 8–131(a). *Accord Wm. S. Baker, Inc. v. Sims,* 589 S.W.2d 492 (Tex.Civ.App.1979).

> XI. Did the trial court err in allowing an expert in electrical engineering to give opinions on medical questions?

PEPCO's next complaint is that the trial court erred when it allowed Mr. Martin, an electrical engineer, to testify about what part of the decedent's body directly contacted the electrical wire. First, argues PEPCO, his testimony was not within the scope of his expertise, and second, he based his opinion solely on photographs he had seen and not from his personal knowledge.

It is firmly established that the admissibility of expert testimony is within the trial court's discretion. The court's action in this area seldom provides a basis for reversal, although it may be reviewed on appeal and reversed for an abuse of discretion, error of law, or other

serious mistake. *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977). The test of admissibility of expert testimony is whether the expert's opinion will aid the trier of fact. *Consolidated Mechanical Contractors, Inc. v. Ball,* 263 Md. 328, 338, 283 A.2d 154 (1971). The court determines the competency of the witness to testify as to matters within his expertise. *Stickell v. City of Baltimore,* 252 Md. 464, 474, 250 A.2d 541 (1969). Whether a witness is qualified can only be determined by the nature of the opinion he offers. *Gladhill v. General Motors Corp.,* 743 F.2d 1049 (4th Cir.1984). *See also Novak v. Workmen's Compensation Appeal Bd.,* 59 Pa.Cmwlth. 596, 430 A.2d 703, 706 (1981) (even though not a physician, microbiologist testified within the scope of his expertise when he explained the effects of leptospirosis on human body, methods to test for such disease, and negative sera test results performed by CDC on two specimens). To qualify as an expert, a person must show a minimum level of competency on the subject on which he is to testify. *Id.; see also Gladhill, supra* 743 F.2d at 1052. A person will qualify if the court is satisfied that his or her experience in the subject matter is such that it entitles the testimony "to credit." *Winkles v. State,* 40 Md.App. 616, 622, 392 A.2d 1173 (1978), *cert. denied,* 284 Md. 751 (1979).

Furthermore, an expert is not required to possess direct personal knowledge of a matter in order to express an opinion. *State Farm Fire & Cas. Co. v. Sawyer,* 522 So.2d 248, 250–52 (Ala.1988) (expert witness allowed to give an opinion even though hypothetical question was based on photographs and expert had not personally inspected scene at time of fire); *Bastian v. Laffin,* 54 Md.App. 703, 712–14, 460 A.2d 623 (1983) (expert's appraisal based solely on a description of items was admissible as evidence). Just as a medical expert may base an opinion on an X-ray or as any expert may render an opinion based on a hypothetical question, so also may an expert give an opinion based on photographs. *Id.; Woyak v. Konieske,* 237 Minn. 213, 54 N.W.2d 649, 655 (1952). Complaints about the manner in

which the expert derived and stated his opinion go to the weight to be given to his testimony rather than its admissibility. *Bastian, supra,* 54 Md.App. at 713, 460 A.2d 623.

In the instant case, the court accepted Martin as an expert after his testimony demonstrated his credentials and training and after plaintiff's counsel indicated the nature of his testimony. Martin's testimony established that he was an electrical engineer with a special expertise in electrical injuries, electrical personal injury investigations, and the physical effects of electricity on the human body. His testimony was offered to show what part of the decedent's body came into direct contact with the power line and what part of her body completed the electrical circuit once there was contact between her body and the power line. Martin's comments establishing the nature and the origin of the decedent's injuries were well within the scope of his training and areas of expertise. He explained what occurs when a human body becomes part of an electrical circuit. He described the increased heat that results both internally and externally. Externally, the body burns at the point of contact with the power line and also on those parts of the body exposed to the current due to electrical arcing. He then went on to describe the marks on decedent's body as electrical burns and to offer his opinion as to their origin based on their characteristic appearance.

Martin based his opinion as to the effect of the current on the decedent's body on his interpretation of the characteristic marks depicted in the photographs of the body. Thus, being ever mindful of the applicable law, we hold that the trial court did not err when it allowed Martin to give his opinion as to what part of the decedent's body came into direct contact with the power line.

XII. Did the trial court properly and fully instruct the jury as to the law?

Finally, PEPCO contends that the trial court committed several errors in its instructions (or lack of instructions) to

the jury. First, PEPCO contends that the trial court erred in its instruction regarding the standard of care it owed the decedent. As we discussed and resolved earlier in this opinion, section I, the trial court's instruction did not constitute reversible error.

■ Next, PEPCO claims the trial court erred in its instruction to the jury regarding the issue of contributory negligence. In section II of this opinion, we determined that the trial court properly submitted the issue to the jury. PEPCO here states that the court erred in refusing to instruct the jury that the decedent was required to exercise ordinary or due care for her own safety. A review of the trial court's instructions, however, indicates that the court specifically instructed the jury that if "the deceased plaintiff failed to use ordinary or due care for her own safety," she would be "contributorily negligent." *See* section II, footnote 10. In addition, the trial court instructed the jury that the standard of care to be measured was that which "a prudent child of her age, of her intelligence, of her experience and development would have used under the same or similar circumstances." This instruction is consistent with the applicable law on contributory negligence. *See Schweitzer v. Brewer*, 280 Md. 430, 439, 374 A.2d 347 (1977); *Menish v. Polinger*, 277 Md. 553, 559, 356 A.2d 233 (1976); *McSlarrow v. Walker*, 56 Md.App. 151, 161, 467 A.2d 196 (1983), *cert. denied*, 299 Md. 137, 472 A.2d 1000 (1984); *Brown v. Rogers*, 19 Md.App. 562, 566, 313 A.2d 547 (1974). Therefore, we hold that the trial court properly instructed the jury on the issue of contributory negligence.

PEPCO also challenges the court's instruction regarding punitive damages. PEPCO mistakenly alleges that the court failed to inform the jury that punitive damages are awarded to punish a wrongdoer, that they are discretionary with the jury, and of the exact degree of malice necessary as a prerequisite to recovery of punitive damages. A review of the record clearly reflects the contrary. *See* footnote 25. This instruction is also a correct statement of the law. *See* our discussion in Section III. Consequently,

we hold that the court committed no error in instructing the jury on the issue of punitive damages.

JUDGMENTS AFFIRMED: ONE–THIRD COSTS TO BE PAID BY APPELLEES. TWO–THIRDS COSTS TO BE PAID BY APPELLANT.

## APPENDIX

*Annapolis Gas & Electric Light Co. v. Fredericks*, 109 Md. 595, 72 A. 534 (1909). (court applied standard of ordinary diligence in holding that jury question arose as to whether defendant knew or should have known that a live electric wire was sagging close to a public bridge).

*Brown v. Edison Elec. Illuminating Co.*, 90 Md. 400, 45 A. 182 (1900) (where cleaning boy was injured when he came into contact with defendant's electrical wire, which was strung less than one foot from the house, the defendant held to a negligence standard).

*Consolidated Gas, Electric Light & Power Co. v. State*, 109 Md. 186, 72 A. 651 (1909). (where telephone lineman was killed after touching an uninsulated electric wire strung along the same pole on which he was working, question of his contributory negligence for not wearing rubber gloves is for the jury; electric company held to a negligence standard in failing to re-insulate wire two weeks earlier).

*Dageforde v. The Potomac Edison Co.*, 35 Md.App. 37, 369 A.2d 93 (1977). (defendant not liable where plaintiff failed to show that he was not trespassing by climbing defendant's pole).

*Driver v. Potomac Elec. Power Co.*, 247 Md. 75, 230 A.2d 321 (1967). (plaintiff was guilty of contributory negligence as a matter of law where the boom of a well-digging rig that was operating came into contact with defendant's overhead electric wires).

*Eastern Shore P.S. Co. v. Corbett*, 227 Md. 411, 177 A.2d 701 (1962). (defendant held to ordinary standard of negligence where a building painter was injured while painting a

building under construction near electric wires and defendant failed to give notice to any of the construction workers that the electricity would be turned on).

*Hagerstown & Frederick Railway Co. v. State,* 139 Md. 507, 115 A. 783 (1921). (defendant held to a "high degree of care commensurate with the danger" where a fallen limb struck one of its wires causing the wire to come into contact with a fence adjacent to a public highway; plaintiff's decedent was killed when he touched the electrified fence).

*LeVonas v. Acme Paper Board Co.,* 184 Md. 16, 40 A.2d 43 (1944). (plaintiffs were contributory negligent where steel beams that were loading onto a truck came into contact with defendant's uninsulated, high electric wire because they knew or should have known of the presence of the wire).

*Liscombe v. Potomac Edison Co.,* 303 Md. 619, 495 A.2d 838 (1985). (where plaintiff was injured when he raised the bed of a tractor-trailer he was driving, causing it to come into contact with defendant's electrical wires, and he knew or should have known of the presence of the wires, he was contributorily negligent as a matter of law).

*Murphy v. Baltimore Gas & Elec. Co.,* 290 Md. 186, 428 A.2d 459 (1981). (defendant only had a duty to "abstain from willfully or wantonly injuring or entrapping" plaintiff where plaintiff sustained injury after climbing and reaching into high voltage electrical transformer that he thought was a trash receptacle).

*Southern Md. Elec. Co-op. v. Blanchard,* 239 Md. 481, 212 A.2d 301 (1965). (plaintiff was contributorily negligent as a matter of law where he came into contact with a live, electrical wire while attempting to install a television antennae atop his trailer because he knew or should have known of the wire's presence).

*State v. Eastern Shore Gas & Elec. Co.,* 155 Md. 660, 142 A. 503 (1928). (plaintiff was contributorily negligent under factual circumstances similar to *Blanchard, supra* ).

*State v. Crisfield Ice Mfg. Co.*, 118 Md. 521, 85 A. 615 (1912) (where electric company left a high voltage wire hanging close to the ground by a gutter along a public street, it was negligent; where a child touched this wire after being warned not to do so, he was contributorily negligent).

*State v. Chesapeake & Potomac Telephone Co.*, 123 Md. 120, 91 A. 149 (1914). (where plaintiff's decedent was killed after coming into contact with a live wire while climbing defendant's utility pole to retrieve a pet, he was a trespasser and the defendant had no duty "to provide against the possibility that their own appliances might be utilized by strangers as a means of access to the conditions which prove to be injurious").

*Walter v. Baltimore Electric Co.*, 109 Md. 513, 71 A. 953 (1909). (where a wire strung by defendant falls upon a person walking, upon a public street, a prima facie case of defendant's negligence is established).

*Ziehm v. United Electric Light & Power Co.*, 104 Md. 48, 64 A. 61 (1906). (issue of contributory negligence is for the jury where plaintiff, a telephone company lineman, sustained injury when his hand came in contact with a live electric wire strung very close to the pole that he was climbing down).